UNITED STATES of America, Plaintiff,

v.

$359,500 IN UNITED STATES CURRENCY, Defendant.

No. Civ–84–661C.

United States District Court, W.D. New York.

Sept. 29, 1986.

Roger P. Williams, U.S. Atty. (Frank J. Clark, III, Asst. U.S. Atty., of counsel), Buffalo, N.Y., for plaintiff.

Murray Appleman, New York City, for claimant Benedetto Romano.

CURTIN, Chief Judge.

The United States seeks the forfeiture of $359,500 in United States currency pursuant to 31 U.S.C. §§ 5316(a) and 5317(b). Claimant Benedetto Romano opposes this forfeiture.

A non-jury trial was held May 10, 1985. Post-trial briefs were filed, and summations were heard in July. After taking the case under advisement, I found a need for further briefing and ordered the parties to address certain issues (Order of November 19, 1985). The briefs were filed in December. Due to the large number of cases on my docket, I was unable to review counsel's most recent submission for some time. Now, after careful consideration of the issues presented by this case, I find that forfeiture is not proper under the circumstances and direct that the defendant currency be returned to claimant. Below are my findings of fact and conclusions of law.

On November 17, 1983, Benedetto Romano crossed the Peace Bridge, heading from Buffalo, New York, to Ontario, Canada. When he crossed to the Canadian side of the bridge, he spoke with a Canadian Customs official at the primary inspection area. For reasons which were never established at trial, Mr. Romano was referred to the secondary inspection station (Tr., p. 10).

At the secondary station, Mr. Romano spoke with another Canadian Customs official, Bruce Mehlenbacher. Mr. Mehlenbacher could not recall the substance of the conversation (Tr., p. 11), but remembered that Mr. Romano had planned to stay in Canada for just a few days. Mr. Romano opened his trunk at Inspector Mehlenbacher's request. There were some bags containing several thousand dollars in the trunk. Mehlenbacher asked whether Romano had declared the money before exporting it from the United States; Mr. Ro-

mano replied that he had not (Tr., pp. 11–12).

Although there are no Canadian regulations governing the importation of money, Mehlenbacher was suspicious of the unusually large sum Mr. Romano was carrying. He did not permit Mr. Romano to enter Canada and, after alerting United States Customs, ordered him to return to the United States (Tr., pp. 12–13, 17).

Once he had crossed back over the bridge and returned to the American side, Mr. Romano was questioned by Immigration Officer Samuel J. Tiranno. Mr. Tiranno testified that Romano admitted to having some currency, eventually stating that he had more than $300,000 (Tr., p. 28). Mr. Romano was sent to the secondary inspection area, where he completed Form 4790, Report of International Transportation of Currency or Monetary Instruments (Exhibit 1). He also filed a baggage declaration form, Customs Form 6059-B, which was printed in Italian (Exhibit 2). In response to the question of whether he was carrying more than $5,000, Mr. Romano checked "Yes." A records check revealed that Mr. Romano had not completed any forms, including the required Form 4790, when he had crossed the bridge earlier that day (Tr., p. 54). Since Mr. Romano failed to file these forms before he crossed the bridge, the money was confiscated.

Officer Tiranno also testified about the arrangement at the Peace Bridge. As a person approaches the Peace Bridge from Buffalo, he must pass through a toll booth and pay a fee for crossing the bridge. Only after he has crossed the bridge and entered the Canadian Customs compound does the traveler encounter any customs officials. He is then, for the first time, questioned about his citizenship and any items he may wish to declare (Tr., pp. 35–37).

The parties stipulated that there are no signs or other notice on either side of the bridge to inform travelers of the currency reporting requirements (Tr., p. 5). The only notices available on the American side of the bridge appear in the administrative office. An ordinary traveler, who was not made aware of the currency reporting requirements, would have no reason to enter the administrative office (Tr., p. 49). There was no evidence adduced at trial to indicate that Mr. Romano had any knowledge of the reporting requirements, and I find that he had no such knowledge.

At the time the money was seized from Mr. Romano, 31 U.S.C. § 5316(a) provided:

> Except as provided in subsection (c) of this section, a person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly—
>
> (1) transports or has transported monetary instruments of more than $5,000 at one time—
>
> (A) from a place in the United States outside the United States; or
>
> (B) to a place in the United States from or through a place outside the United States; or
>
> (2) receives monetary instruments of more than $5,000 at one time transported into the United States from or through a place outside the United States.[1]

Among those courts which have considered the issue, there is a split as to whether the word "knowingly" in section 5316 applies solely to a person's knowledge that he is carrying in excess of $5,000 (now $10,000) over the border, or whether it also includes knowledge of the reporting requirement. Claimant raised this issue before trial in the context of a motion for summary judgment. I denied the motion in a brief order, relying upon a case from the Southern District of Florida. *United States v. $4,255,625.39*, 528 F.Supp. 969 (S.D.Fla.1981).

■ Several months after my decision denying summary judgment, the Eleventh Circuit addressed this issue and concluded

---

**1.** The statute was amended in 1984, so that reports are necessary only for monetary instruments exceeding $10,000 in value. The amendment has no bearing on this case, and in any event, Mr. Romano was carrying well in excess of $10,000.

that knowledge of the reporting requirement is an element in a civil forfeiture proceeding under sections 5316 and 5317.[2] *United States v. One Lot of $24,900 in U.S. Currency,* 770 F.2d 1530 (11th Cir. 1985). The question remains undecided in this circuit. *United States v. $26,660 in U.S. Currency,* 777 F.2d 111, 112 (2d Cir. 1985). I find the analysis of the United States Court of Appeals for the Eleventh Circuit to be persuasive, and, after reconsideration, in light of that decision, hold that knowledge of the reporting requirement is necessary in a civil forfeiture proceeding under sections 5316 and 5317.

In concluding that knowledge is a requirement in a civil forfeiture proceeding, the Eleventh Circuit Court of Appeals relied in part upon the legislative history. *United States v. $24,900, supra.* The court noted that sections 5316 and 5317 are part of the Currency and Foreign Transactions Reporting Act of 1970 [the Act].

■ The purpose of the Act is to require reports of foreign transactions where such reports would be helpful in investigations of criminal, tax, and regulatory violations. 770 F.2d at 1534. Another purpose, unrelated to criminal investigations, is to gather statistics necessary for the formulation of monetary and economic policy. House Committee on Banking and Currency, H.R.Rep. No. 975, 91st Cong., 2d Sess., *reprinted in* 1970 U.S. Code Cong. & Ad. News 4404–4405 [*House Report*].

■ The goal of Congress in passing the Act was to obtain currency reports, not to prevent the exportation of United States currency. As emphasized in the *House Report* at 4398:

The Bill imposes no legal limitation on the export of U.S. currency .... Those

leaving the United States have always been free to take with them such amounts of cash or other forms of money as they choose.

The Act was not intended to limit in any way the free flow of currency in international commerce. *United States v. $24,-900,* 770 F.2d at 1535.

In view of the legislative history, it would make little sense to interpret "knowingly" as not applying to the reporting requirement:

Thus, the purpose of the Act—obtaining reports—could only be achieved if travelers were made aware of the reporting requirements. If one is unaware of the reporting requirement, one cannot be expected to comply, notwithstanding the possibility of a subsequent forfeiture, or any other sanction. To interpret "knowingly" as used in the reporting requirements as not requiring knowledge of the reporting requirements would in effect mean that travelers need not be made aware of the reporting requirements .... We find that such an interpretation of "knowingly" would fly in the face of Congress' goal of obtaining currency reports.

\* \* \* \* \* \*

A signal would be sent that United States law may well be filled with boobytraps that spring without warning to grab the currency of unsuspecting travelers.

*Id.* at 1535.

Additionally, the language of the forfeiture section lends support to the Eleventh Circuit's conclusions. Section 5317(b) (now c) states that a monetary instrument may be seized and forfeited to the United States

---

2. Section 5317 states:

\* \* \* \* \* \*

(b) A monetary instrument being transported may be seized and forfeited to the United States Government when a report on the instrument under section 5316 of this title has not been filed or contains a material omission or misstatement. A monetary instrument transported by mail or a common carrier, messenger, or bailee is being transported under this subsection

from the time the instrument is delivered to the United States Postal Service, common carrier, messenger, or bailee through the time it is delivered to the addressee, intended recipient, or agent of the addressee or intended recipient without being transported further in, or taken out of, the United States.
(Note: In the 1984 amendments, this subsection was relettered and is now subsection "c." There are no relevant substantive changes.)

(1) when a report is not filed *or* (2) when the report contains a material omission or misstatement. In the latter case, the individual presumably would have had knowledge of the reporting requirement.

The government points to cases in which the innocence of the *owner* of the property does not affect the validity of a forfeiture. In *United States v. $6,700* 615 F.2d 1 (1st Cir.1980), the administrator of an estate embezzled money from the estate. The administrator brought $6,700 of the estate's money into the United States without filling out the required forms, and the money was seized. The estate claimed the $6,700. The First Circuit Court of Appeals permitted the forfeiture, holding that forfeiture is not dependent on the wrongdoing of the *owner* of the monetary instruments. *Id.* at 3 (*see also United States v. $20,-757.83,* 769 F.2d 479 (8th Cir.1985) *and, generally, Calero-Toledo v. Pearson Yacht Leasing Co.,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974)).

However, the facts in those cases are distinguishable from the case at bar, in which the knowledge of the individual who *transported* the money over the border is at issue. Here, Mr. Romano is the transporter as well as the claimant. As stated by the Eleventh Circuit in distinguishing *United States v. $6,700, supra:*

> [N]o claim was made in the First Circuit case, *$6,700,* ... that the *traveler* who transported the money was "innocent" in the sense that he lacked knowledge of the reporting requirements. *$6,700* involved a totally different question from the one we face here and we do not find the rationale employed there transferable: nothing in the language of the statute or its legislature history indicates that the innocence of the *nontransporting* owner or claimant prevents forfei-

ture; but there is an indication that the *transporter's* lack of knowledge of the reporting requirements does prevent forfeiture. We thus reject the reasoning of the trial court in *$5,393* [*U.S. . v. $5,393.00,* 583 F.Supp. 1447 (E.D.N.Y. 1984)], and conclude that nothing we have said in this opinion conflicts with the First Circuit's decision in *$6,700.*

*United States v. $24,900,* 770 F.2d at 1536 (emphasis in original).

Some courts have concluded that knowledge of the reporting requirement is necessary only if the violation of section 5316 must be willful, or only in a criminal context. In a criminal action, the government must show that an individual "willfully" violated the reporting requirements. 31 U.S.C. § 5322(a). *See United States v. $4,255,625.29 supra,* and *United States v. $5,393.00, supra.*

However, as was noted by the Eleventh Circuit in *United States v. $24,900,* the terms "knowingly" in section 5316 *and* "willfully" in section 5322 together construed require both knowledge of the reporting requirement and intent to violate the law. *Id.* at 1532–33. *See United States v. Granada,* 565 F.2d 922, 925–26 (5th Cir.1978). Moreover, requiring knowledge of the reporting requirement in a civil forfeiture proceedings would not make the government's burden the same in both civil and criminal proceedings. In a criminal action, the government would have the burden of showing knowledge, as well as willfullness (§ 5322(a)), beyond a reasonable doubt.[3]

 In the alternative, even if section 5316 does not require the government to show that the individual had *actual* knowledge of the reporting requirements, due

---

**3.** The government also cites *One Lot Emerald Cut Stones v. United States,* 409 U.S. 232, 93 S.Ct. 489, 34 L.Ed.2d 438 (1972), in support of its position. In that case, however, the issue was rather whether a prior acquittal in a criminal case could bar a civil forfeiture proceeding. The criminal statute, 18 U.S.C. § 545, required intent to defraud the United States, which the trial court could not find beyond a reasonable

doubt. *Id.* at 234, 93 S.Ct. at 491–92. The court noted that in a forfeiture proceeding, the government has no burden with respect to intent, and so the civil proceeding was not barred. The court made no specific finding with regard to knowledge. Moreover, the forfeiture statute at issue in that case, 19 U.S.C. § 1497, does not contain the term "knowledge."

process requires that there be some form of notice of the reporting requirement.

Possessing and transporting currency is, in and of itself, legal. There is no inherent notice, as in the case of narcotics or firearms, that there may be limitations on its transportation across a border. As has been noted, there are no signs along the Peace Bridge stating that currency beyond a certain amount must be reported. Nor, as was explained at trial, is the traveler crossing the Peace Bridge into Canada asked any questions by American Customs authorities. He is not asked his citizenship, residence, or whether he has anything to declare until he arrives on the Canadian side. In the ordinary course, this would make sense, since the United States generally has more interest in what is being brought into the country than in what travelers are carrying out of the country.

In this case, however, the government wishes to have it both ways. Mr. Romano was not questioned until he reached the Canadian side of the bridge. At that time, he admitted to possessing several thousand dollars and later filled out the appropriate forms. The government maintains that this was too late, since he had already departed the country (*see* discussion, *infra*). Yet, as the evidence shows, there was no notice or any meaningful opportunity to inquire about any currency limitations until he had reached the Canadian side.

In most cases in which courts found knowledge to be immaterial in a civil forfeiture proceeding under 31 U.S.C. § 5317, the claimant nonetheless had *some* notice of the requirements. In *$5,393, supra,* claimant was given a reporting form, but claimed to be unaware that it applied to her. *Id.* at 1449–50. In *United States v. $4,255,625.39, supra,* at least one of the claimants, a bank, filled out the reporting forms.

In *United States v. 66 Pieces of Jade and Gold Jewelry,* 760 F.2d 970 (9th Cir. 1985), claimant failed to declare certain items under 19 U.S.C. § 1497 (which makes no explicit reference to "knowledge"). There, although not specifically told that jade must be declared, the claimant was asked what he was bringing into the country and replied "nothing." The trial court found that he had an opportunity to declare the jewelry. *Id.* at 972–73.

The government contends that the notice requirement of due process is satisfied by the filing and service of a complaint in forfeiture. However, at that point, the notice is frequently not meaningful. Assuming knowledge of the reporting requirement is unnecessary, once an individual, knowing he had more than $5,000 (now $10,000), departed the United States without filing the appropriate form, forfeiture is almost assured. Notice and a hearing would be of little value at that point. Under these circumstances, the only meaningful notice of the reporting requirements would be one given before the point of departure.[4]

■ Even if actual knowledge of the reporting requirements is not required for a civil forfeiture, some notice, or opportunity to learn, must be provided. Since it is undisputed that there were no signs along the border or other form of notice, Mr. Romano had no notice or opportunity to learn of the requirement, and forfeiture is not proper.

■ Mr. Romano raises several other points, without merit, which will be briefly discussed. He claims that since he did not enter into Canada, he never departed the United States for purposes of the statute. Although not stated in section 5316, accompanying regulations require that a report be filed "at the time of departure" from the United States. 31 C.F.R. § 103.25(b).

In *United States v. Cutaia,* 511 F.Supp. 619 (E.D.N.Y.1981), a criminal case, the court was faced with the issue of when the time of departure is reached. *See also United States v. Rojas,* 671 F.2d 159 (5th Cir.1982), and *United States v. Ozim,* 779

---

**4.** Although the traveler may seek administrative redress, the redress lies in the discretion of the Secretary, who may remit all or part of the money (§ 5321(c)).

F.2d 1017, 1018 (4th Cir.1985). In *Cutaia,* the court found that the time of departure under 31 U.S.C. § 5316 (then § 1101) had been reached when defendants had checked their bags with the airline, obtained boarding passes, and were waiting to board the plane. The court stated:

Good sense suggests that the time of "departure" does not mean the moment when the aircraft leaves the landing field. By that moment the officials would have no effective means of enforcing the statute. It is more in accord with the manifest purpose of the legislation to construe the time of "departure" as that time reasonably close to the moment of the carrier's actual departure when the passenger has manifested a definite commitment to leave the country . . . .

*Id.* at 624–25.

In this case, Mr. Romano did not enter Canada (Tr., p. 14). However, he crossed over the Peace Bridge and entered the Canadian Customs compound. At that point, he was under the control of the Canadian Customs officials and out of the United States. By crossing the bridge and attempting to enter Canada, claimant manifested a clear intention to leave the United States. For the purposes of 31 U.S.C. §§ 5316, he had reached the point of departure.

Romano also claims that the close cooperation between American and Canadian Customs personnel places them in an agency relationship. Mr. Romano was neither questioned nor inspected upon leaving the American side of the bridge. People crossing the bridge into Canada are first inspected on the Canadian side. If a person is carrying unauthorized merchandise, or if his immigration papers are not in order, or for many other reasons, he will be returned to the United States. In most cases, this would not create an agency relationship between Customs officials.

In this case, Inspector Mehlenbacher knew that Mr. Romano had not declared or reported the money to American officials. There are no Canadian laws regarding importation of currency. Mr. Romano claims that a violation of American law was the sole reason he was ordered to return. Mr. Romano maintains that Inspector Mehlenbacher was therefore acting as an agent of the United States and that acknowledgements made to the inspector should satisfy the reporting requirements.

I find that Inspector Mehlenbacher denied Romano entry into Canada, in part, out of spirit of cooperation with American Customs and, in part, based on his concerns about Mr. Romano's purpose for visiting Canada. In 13 years as an inspector, Inspector Mehlenbacher had never seen such a large amount of currency transported over the bridge. His suspicions were heightened because Romano had not declared the money in the United States and was to be staying in Canada for just a short time (Tr., pp. 17 and 19). On the facts of this case, Inspector Mehlenbacher and other Canadian Customs officials were not acting as agents of the United States. If Inspector Mehlenbacher had ordered Mr. Romano to return to the United States *solely* based upon his failure to declare the money to American Customs officers, as required by American law, the argument would be more persuasive.

Finally, Mr. Romano urges that Customs officers were required to obtain a search warrant to inspect his car. Since Canadian officials were not acting as agents of the United States or at the direction of United States Customs officials, they were not required to obtain a warrant or advise Mr. Romano of his rights before questioning him and inspecting the car.

Mr. Romano cites *United States v. Chemaly,* 741 F.2d 1346 (11th Cir.1984), a criminal case in which the court held that, under 31 U.S.C. § 5317(a), a warrant is required to search those leaving the country. However, officers were still entitled to search, incident to arrest, if there had been probable cause for arrest. In that case, there was not. Nor was there any probable cause to search a baggage carrier in *People v. Esposito,* 37 N.Y.2d 156, 371 N.Y.S.2d 681, 332 N.E.2d 863 (1975), also a criminal case.

The instant case is a civil proceeding, not a criminal action. Assuming, without deciding, that American Customs officials needed probable cause (*see Tirado v. Commissioner of Internal Revenue*, 689 F.2d 307 (2d Cir.1982), *cert. denied*, 460 U.S. 1014, 103 S.Ct. 1256, 75 L.Ed.2d 484 (1983)), there was probable cause in this case. Inspector Mehlenbacher called American Customs officials, told them he had just found a car with a large amount of money, provided the license plate number, and told them he was sending the car back.

Plaintiff's petition for forfeiture is denied. The defendant currency shall be returned to claimant.

So ordered.