**UNITED STATES of America,
Plaintiff,**

**v.**

**NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, Glenn H. Ripa, Esq., and Benedetto Romano, Defendants.**

No. 99–CV–104C.

United States District Court,
W.D. New York.

March 9, 2001.

United States Department of Justice, Tax Division (Alan Shapiro, Peter Sklarew, of Counsel), Washington, DC, Denise E. O'Donnell, United States Attorney (Gregory L. Brown, Assistant United States Attorney, of Counsel), Buffalo, NY, for Plaintiff.

Glenn H. Ripa, New York, NY, for Defendants.

## INTRODUCTION

CURTIN, District Judge.

On November 17, 1983, Benedetto Romano drove across the Peace Bridge from Buffalo, New York, to Ontario, Canada, with $359,500 in undeclared currency in his trunk. He was stopped by Canadian officials, denied entry into Canada, and sent back to the United States' side of the bridge. Because Mr. Romano had failed to file proper forms declaring that he was transporting over $5,000 in U.S. currency outside of the United States, U.S. Customs officials seized the funds pursuant to 31 U.S.C. §§ 5311, 5316, and 5317 (1994). In this interpleader action, the court determines the rights of the rival claimants to the seized funds. The Internal Revenue Service, Glenn Ripa (Mr. Romano's current attorney), Mr. Romano, and the New York State Department of Taxation all have claims on the funds.[1]

Presently before the court is a motion for summary judgment submitted by Mr. Ripa and Mr. Romano (Item 19), and a cross-motion for summary judgment submitted by the Internal Revenue Service. Item 22. The New York State Department of Taxation has not opposed Romano's and Ripa's motion. Item 26. New York admits that its claim is subordinate to that of the United States' federal income tax claim. Item 18.

## BACKGROUND

While the parties have stipulated (Item 21) that the factual information contained

---

1. The U.S. Customs Service was divested of all legal right or interest in the subject currency as a result of this court's dismissal of the underlying civil forfeiture action, *United States v. $359,500 United States Currency,* 84–CV–661 (Item 86). Without a cognizable interest in the funds, Customs withdrew from the action and left it to the disputants to establish the legitimacy and priority of their competing claims. The United States assert-

ed a proceeding "in the nature of" interpleader, in which it claims an interest in all or part of the stake. Given that "departments, agencies and subdivisions of the United States Government constitute a single creditor for purposes of setoff," the interests of the IRS are represented by the United States as plaintiff. *In re Whimsy, Inc.,* 221 B.R. 69, 72 (S.D.N.Y.1998).

in *United States v. $359,500 in United States Currency*, 645 F.Supp. 638 (W.D.N.Y.1986) and in *United States v. $359,500 in United States Currency*, 25 F.Supp.2d 140 (W.D.N.Y.1998) shall be treated as the facts in this case, a brief rendition of the relevant facts are nevertheless set forth herein.

As noted earlier, on November 17, 1983, the U.S. Customs Service seized $359,500 in undeclared currency from Romano pursuant to 31 U.S.C. §§ 5311, 5316 and 5317 (1994) as he drove his car across the Peace Bridge from Buffalo, New York, into Ontario, Canada. On the same day, the IRS made a termination assessment [2] against Mr. Romano for his 1983 income tax in the amount of $169,973, pursuant to 26 U.S.C. § 6851. Item 23, ¶ 2. On November 18, 1983, the IRS filed a notice of federal tax lien. *Id.* ¶ 3. Romano failed to file a tax return for the year 1983. The New York State Department of Taxation and Finance has also docketed tax warrants against Mr. Romano.[3]

In 1984, the United States Department of Customs filed a civil asset forfeiture action against the seized funds, pursuant to 31 U.S.C. §§ 5316 and 5317. *United States v. $359,500 in United States Currency*, 645 F.Supp. 638 (W.D.N.Y.1986). On August 6, 1987, the seized currency was deposited into the U.S. Customs Suspense Account, located at the Federal Reserve Bank of New York. Item 23, ¶ 4. On September 29, 1986, this court denied the government's petition for forfeiture, holding that a civil forfeiture, based on a failure to declare currency prior to transporting it outside of the country, requires that the owner have actual knowledge of the obligation to report. The government appealed. The Second Circuit Court of Appeals reversed, ruling that constructive knowledge is sufficient to support a forfeiture, and remanded for a determination of Romano's constructive knowledge of the obligation to report. *United States v. $359,500 in United States Currency*, 828 F.2d 930 (2d Cir.1987).

This court stayed the action when Romano invoked his Fifth Amendment right against self-incrimination based upon a pending criminal tax evasion indictment.[4] After the criminal proceedings ended, this court found that Mr. Romano did not have constructive knowledge of the reporting requirement and that forfeiture to the government of the $359,500 was improper. *United States v. $359,500 in United States Currency*, 25 F.Supp.2d 140 (W.D.N.Y. 1998). On January 28, 1999, an order was issued allowing an interpleader action in order that the interested parties could litigate the proper distribution of the seized

---

2. A termination assessment informs the person notified that his or her tax year is terminated as of a certain date and calculates the income tax due. The resulting tax liability becomes due immediately, and the IRS files a tax lien to secure payment of the tax debt. The IRS uses a termination assessment when it discovers that a person possesses an inappropriate amount of cash presumed to be taxable income from a previously undisclosed source and it fears that the collection of taxes may be thwarted if the person puts the cash or [him]self beyond the government's reach. *United States v. Romano*, 938 F.2d 1569, 1570 (2d Cir.1991).

3. The warrants were docketed with the Queens County Clerk, including one filed March 23, 1994 in the amount of $48,549.15; two filed on Dec. 30, 1997 in the amounts of $22,296.14 and $98,040.07; and one docketed on Sept. 25, 1998 in the amount of $4,787.88. Item 23, ¶ 16.

4. Romano's conviction on one count of tax evasion in the Eastern District of New York was reversed by the Second Circuit in *United States v. Romano*, 938 F.2d 1569 (2d Cir. 1991).

funds. Item 89.[5] The court also required that the funds, plus accrued interest, be deposited with the Clerk of the Court. *Id.*

Concurrent with the forfeiture proceeding, Mr. Romano appeared in a number of other courts on tax-related matters. In 1985, Mr. Romano filed a petition in the United States Tax Court challenging the 1983 deficiency notice. *Romano v. Commissioner,* 101 T.C. 530, 1993 WL 512365 (1993). In November 1989, while the Tax Court deficiency action was pending, the United States filed suit in the U.S. District Court for the Eastern District of New York to reduce the 1983 termination assessment against Mr. Romano to judgment. Item 22, p. 2. On December 19, 1990, the District Court granted summary judgment in favor of the United States in the amount of $169,981 plus statutory interest, as allowed by law, for taxes owed pursuant to the termination assessment. Item 11, Exh. 2. That judgment was affirmed by the Second Circuit on May 6, 1992. Item 11, Exh. 3. Subsequently, Romano's full-year 1983 tax liabilities were the subject of a Tax Court decision, entered on May 13, 1996. Item 22, p. 2. As of August 31, 1999, the amount of the termination assessment, plus statutory interest, due the IRS exceeded $750,000. Item 22, p. 19. Mr. and Mrs. Romano also petitioned the Tax Court with respect to notices of deficiency issued by the IRS for tax years 1981, 1982, 1989 and 1990. The Tax Court found for the IRS. *Romano v. Commissioner,* CCH. Dec. 50,876 (1995). The IRS assessed further tax liabilities against Mr. Romano.[6]

Murray Appleman, Esq. initially represented Mr. Romano in the termination assessment litigation in the Eastern District of New York, the Tax Court litigation, the civil forfeiture case, and the criminal tax prosecution. Following Mr. Appleman's death, Mr. Romano retained Glenn H. Ripa on August 28, 1995 to undertake representation for the remand of the civil forfeiture proceeding. They agreed on a one-third contingency fee arrangement, later modified to include a $7,500 advance payment by Mr. Romano. Item 19, ¶¶ 5, 7.

Mr. Ripa, appearing pro se, has now come before this court to argue, among other theories, that he is entitled to a statutory attorney lien with superpriority status over the federal tax lien pursuant to 26 U.S.C. § 6323(b)(8). He reasons that the superpriority would entitle him to one-third of the total recovery of $491,236.69 (the originally seized $359,500 plus $131,736.69 interest accrued as of January 1999), which equals $163,745.56, less $7,500.00 in advance legal fees, totaling $156,245.56. He further argues that the IRS has second priority for $169,973.00 in satisfaction of the November 17, 1983 notice of levy, that New York has third priority for $48,549.15 in satisfaction of its warrant dated March 23, 1994, and the IRS has fourth priority for the remaining funds in satisfaction of its 1997 and 1998 federal tax liens.

The present dispute arises because the IRS contests Mr. Ripa's priority regimen, and contends that it has first priority based on the fact that its 1983 lien was

---

5. This item number refers to the underlying action, *United States v. $359,500 in United States Currency,* 84–CV–661.

6. On Feb. 28, 1997, the IRS filed a Notice of Federal Tax Lien against Mr. Romano for income taxes for 1983, 1992, and 1993 totaling $601,582.53. This total included the amount of the 1983 termination assessment covered by earlier-filed lien notices. On May 29, 1996, the IRS filed a Notice of Federal Tax Lien against Mr. and Mrs. Romano for income taxes for 1981, 1982, 1989, and 1990 totaling $397,389.52. Item 23, ¶¶ 13, 14.

first perfected and, alternatively, that the attorney lien super priority allowed by section 6323(b)(8) is not applicable. Given that penalties and interest have accrued on the original November 1983 lien and that that lien, plus accrued interest, exceeds the funds being held, if the IRS is entitled to first priority, it will receive the entire amount on deposit with the Clerk of the Court. For the reasons that follow, this court holds that the IRS receives the entire amount of the interpled funds.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The district court must draw all reasonable inferences in favor of the nonmoving party and grant summary judgment only if no reasonable trier of fact could find in favor of the nonmoving party. *See Taggart v. Time Inc.*, 924 F.2d 43, 46 (2d Cir.1991).

In this case, there are no material facts in dispute and the court may grant summary judgment as a matter of law on the matter of lien priority.

### II. Lien Priority

#### A. Common Law Rule: First in Time, First in Right

■ A federal tax lien takes priority over a competing lien unless the competing lien falls within one of the statutory priorities set forth in the Internal Revenue Code, or is a valid state-created lien that became choate prior to the perfection of the federal tax lien.

"When the United States asserts a lien for unpaid taxes, federal common law and

the Federal Tax Lien Act of 1966, 26 U.S.C. §§ 6321–6326 (1976) govern the resolution of priorities among competing claims." *United States v. $319,820.00 in United States Currency*, 634 F.Supp. 700, 702 (N.D.Ga.1986). Federal lien law generally conforms to the "cardinal rule" that a lien "first in time is first in right." *U.S. v. City of New Britain*, 347 U.S. 81, 85, 74 S.Ct. 367, 98 L.Ed. 520 (1954). However, there are exceptions to this general rule, as well as a number of other rules which govern the determination of when a federal or state-created tax lien arises.

■ A federal tax lien arises and is enforceable upon assessment of the tax and demand for payment. 26 U.S.C. §§ 6321 and 6322. The government's lien continues until the taxpayer satisfies the assessed amount or it becomes unenforceable by lapse of time. 26 U.S.C. § 6322. Such lien is for the amount necessary to satisfy the judgment, including costs and interest. 28 U.S.C. § 3201(a).

■ Federal law governs questions of priority between a federal tax lien and a lien or other interest created by state law. *In re McGaughey* 1999 WL 282780 (S.D.Ill.1999) (citations omitted). "Federal tax liens do not automatically have priority over all other liens." *United States v. McDermott*, 507 U.S. 447, 449, 113 S.Ct. 1526, 123 L.Ed.2d 128 (1993). Once perfected, a federal tax lien has priority over all other subsequent state created interests apart from certain interests enumerated in 26 U.S.C. § 6323. *Guziak v. Guziak*, 609 F.Supp. 65, 70 (W.D.Wis.1985).

When viewing the competing demands on the seized $359,500, it is undisputed that the IRS Notice of Federal Tax Lien, filed November 18, 1983, arose first in time. The IRS lien preceded Mr. Ripa's 1995 entry into the case by over a decade, and preceded the 1994 New York State

warrants by almost as long a time. Therefore, based on the common law, the IRS lien would be entitled to priority, and the IRS would receive the entire amount deposited with the Clerk of the Court. The statutory interest and penalties accruing on the original 1983 termination assessment of $169,973.00, subsequently reduced to judgment, now exceed $750,000.

However, section 6323(b)(8) of the Internal Revenue Code must also be considered before the court can finally decide the priority of the competing claims.

## B. Three Elements of Section 6323(b)(8) Applicability

■ Section 6323(b)(8) of the Internal Revenue Code provides protection for attorney's liens even though a tax lien had previously attached and a notice had been filed by the government. It allows later attorney's liens to supercede the government's "first in time, first in right" priority, unless an exception applies.

Section 6323(b)(8) provides that an earlier filed lien asserted by the IRS under 26 U.S.C. § 6321 is not valid against an attorney, under the following circumstances:

With respect to a judgment or other amount in settlement of a claim or of a cause of action, as against an attorney who, under local law, holds a lien upon or a contract enforceable against such judgment or amount, to the extent of his reasonable compensation for obtaining such judgment or procuring such settlement, *except* that this paragraph shall not apply to any judgment or amount in settlement of a claim or of a cause of action against the United States to the extent that the United States offsets such judgment or amount against any liability of the taxpayer to the United States.

(Emphasis added).

An attorney's lien has priority over a federal tax lien *except* "when the lien is upon a judgment or amount in settlement of a claim or action against the United States in favor of an individual with an outstanding tax liability; in that situation, the federal tax lien has priority over the attorney's lien . . . ." *United States v. $319,820.00 in United States Currency,* 634 F.Supp. 700, 702 (N.D.Ga.1986).

Under case law, in order to benefit from superpriority status, an attorney has to establish three elements:

(1) that a fund was created out of a judgment or settlement of a claim, see *United States v. Kuss,* 69–2 U.S. Tax Cas. (CCH) ¶ 9492 (E.D.Pa.1969); (2) that local law would recognize the existence of a lien, see *id.;* and (3) that the amount of the lien reflects the extent to which [the attorney's] efforts "reasonably contributed to the award." See *Oakland Raiders v. Brown,* 77–1 U.S. Tax Cas. (CCH) ¶ 9440 (N.D.Cal.1976).

*Markham v. Fay,* 1993 WL 160604 (D.Mass. May 5, 1993).

### (1) The Threshold Issue: Was a Fund Created Out of a Judgment?

The threshold issue regarding section 6323(b)(8) applicability concerns whether the "attorney's actions have created a fund of monies via a judgment or settlement of an action." *Warner v. United States,* 1995 WL 693188 at *3 (E.D.Ark.1995) (citations omitted).

■ Federal courts have split on this question. The issue concerns whether the attorney created the fund out of which he may be paid, or whether the attorney "merely defend[ed] or protect[ed] his client's interest in property without obtaining an affirmative recovery." *In re Rosenman & Colin,* 850 F.2d 57, 61 (2d Cir. 1988). An attorney's right to collect out of funds or property he obtains for his client

is premised on the theory that "it is the attorney who has created the fund out of which he is paid by his efforts." *Geron v. Schulman,* (*In re* Manshul Construction Corp.), 225 B.R. 41, 49 (Bkrtcy.S.D.N.Y. 1998) (quoting *In re Rosenman & Colin,* 850 F.2d at 61).

The IRS argues that when this court on remand held that Romano was entitled to the seized funds, Ripa did not create that fund but merely *protected* his client's preexisting property. In other words, the government was only holding Romano's money, and it was always Romano's money until the government won a judgment of forfeiture: Ripa did not *create* a fund by accumulating any *new* money for Romano. In support of its position, the IRS argues by analogy that if a house allegedly used to market illegal drugs was subject to forfeiture, then the attorney's efforts to defend his client's right to retain the house would not be considered creation of a fund any more than would defending the house against the judgment lien of a competing creditor. The IRS cites *McGinley v. United States,* 942 F.Supp. 1239, 1244–45 (D.Neb.1996), in support of that proposition.

In *McGinley,* two law firms sued the IRS which had levied on two stock certificates. The firms claimed a priority to the certificates under section 6323(b)(8) as payment for work performed for their client, who owed taxes to the IRS. The court held that the stock certificates were not equivalent to "a judgment or other amount in settlement" and the law firms failed in their burden of proof under section 6323(b)(8). Because the ruling in the underlying state court action which assigned the stock certificates to the IRS was an interlocutory decision, the *McGinley* court found it was not a judgment, since it lacked "the fundamental character of finality that distinguishes the common

understanding of the word 'judgment' from other court orders." *Id.* at 1245. However-er, the *McGinley* analysis turned on the procedural posture of the case, that an interlocutory decision was not a 'judgment,' not whether stock certificates were 'funds' created out of a judgment.

Ripa argues that he did create a fund when he caused this court to order the return of the $359,500 to Romano. Ripa urges the court to align itself with the more "expansive view of what constitutes the creation of … a fund," where attorneys liens have been recognized with respect to funds created in actions that the taxpayer 'defends' in name only. *Warner v. United States,* 1995 WL 693188 at *4 (E.D.Ark.1995). *Warner* cites *Markham v. Fay,* 1993 WL 160604 at *7 (D.Mass. May 5, 1993), which holds that "an attorney lien may arise when the services rendered, via trial or settlement, operate to place assets in the hands of the taxpayer." *Warner* also cites *Chicago Title Ins. Co. v. Kern,* 81–2 U.S.T.C. (CCH) ¶ 9696, 1981 WL 1873 (D.D.C.1981), which found that attorneys "defending" a taxpayer's claim to an interpleaded fund were entitled to superpriority to the extent that they "did work to garner taxpayer funds which were the subject of a government lien." 1995 WL 693188 at *4. Ripa argues that if he had not contested the IRS claim to the seized funds in the remanded forfeiture case, the funds would have become the property of the government and Romano would not have been entitled to the money. Since he defended and recovered taxpayer funds subject to a lien, under the expansive definition, he created a fund.

It is more in line with the practicalities of seizure and forfeiture that when an attorney successfully recovers taxpayer funds seized and held by the government and returns them to the taxpayer, a fund

*is* created. The court therefore finds that Ripa did create a fund.

However, in order to satisfy the first element of section 6323(b)(8), it is necessary to determine if the fund arose from a judgment or settlement of a claim.

After remand, this court found that claimant Romano was entitled to "judgment in his favor" and ordered the government to return the seized $359,500 to him. *United States v. $359,500 in United States Currency,* 25 Fed. Supp.2d 140, 148 (W.D.N.Y.1998). This decision was in all respects a judgment, as defined in *Towley v. King Arthur Rings, Inc.,* 40 N.Y.2d 129, 386 N.Y.S.2d 80, 351 N.E.2d 728 (1976). "A judgment is the law's last word in a judicial controversy, it being the final determination by a court of the rights of the parties upon matters submitted to it in an action or proceeding." *Id.* at 132, 386 N.Y.S.2d 80, 351 N.E.2d 728 (citations omitted). Clearly, a judgment was arrived at, and the first element of section 6323(b)(8) applicability has been met.

### (2) Does the Attorney Hold a Lien Under Local Law? and (3) Is the Attorney's Fee Reasonable?

The second inquiry, whether the attorney holds a lien under local law, proves more complicated, and results from the intersection of federal and state law. Generally, while federal law determines the rights of priority among competing lienors, state law controls in determining the nature of a taxpayer's interest in property. *Don King Productions, Inc. v. Thomas,* 945 F.2d 529 (2d Cir.1991) (citations omitted). The third inquiry, whether the attorney's fee is reasonable, is solely a matter of law. *Markham v. Fay,* 1993 WL 160604 at *8 (D.Mass. May 5, 1993).

Under New York law, an attorney's lien for services provided in securing a judgment or settlement is governed by section 475 of the Judiciary Law, which codifies the common law "charging lien." Section 475 provides:

From the commencement of an action, special or other proceeding in any court or before any state, municipal or federal department, except a department of labor, or the service of an answer containing a counterclaim, the attorney who appears for a party has a lien upon his client's cause of action, claim or counterclaim, which attaches to a verdict, report, determination, decision, judgment or final order in his client's favor, and the proceeds thereof in whatever hands they may come; and the lien cannot be affected by any settlement between the parties before or after judgment, final order or determination. The court upon the petition of the client or attorney may determine and enforce the lien.

The court will assume, for purposes of this opinion, that Mr. Ripa held an attorney's lien under local law, and that his attorney's fees, based on his one-third contingency contract, were reasonable.[7] In

---

7. Under the New York statute, two elements must be met in order for a valid lien to be asserted: (1) the attorney is limited to a lien on the judgment in his client's favor, which has been interpreted by New York courts to mean that the attorney "has created the fund out of which he is paid by his efforts." (*Rosenman & Colin v. Richard,* 850 F.2d 57, 61 (2d Cir.1988) (citing cases)); *see, Geron v. Schulman, (In re Manshul Construction Corp.),* 225 B.R. 41 (Bkrtcy.S.D.N.Y.1998);

and (2) whether the attorney filed the claim or a counterclaim. The first element, whether the attorney created a *fund* out of which he can be paid, has been explored *supra* in section B(1). The same analysis applies: If the attorney was successful in the latter pursuit, he or she would not be entitled to a lien on the property that his client retains.

Having determined that Ripa did create a fund, in order for an attorney's lien to be valid under local law, "New York courts have

the final analysis, the determination of which party receives the interpled funds turns on whether the exception to section 6323(b)(8) applies. Does the return of the seized funds constitute a "judgment against the United States?" If so, the setoff provision applies, and the IRS receives the interpled funds. Whether the decision to return the funds to Romano was a judgment against the United States follows many of the contours concerning creation of a fund, and allows for a certain consistency in analysis.

### C. Is the Return of Seized Funds a "Judgment Against the United States," Allowing the Setoff Provision to Apply?

Section 6323(b)(8) will not apply if the return of the seized money, pursuant to the court order of September 28, 1998, is a "judgment against the United States." If it is, its provisions would allow the United States to offset the amount of tax liability Romano owes the government. Decisions interpreting what constitutes a "judgment

against the United States" diverge in the same way as the reasoning which underlies whether an attorney "created a fund" (*supra*, section B(1)).

In *United States v. Murray*, 963 F.Supp. 52 (D.Mass.1997), the court analyzed this issue in a hyper-technical manner. The *Murray* court held that currency seized in a civil forfeiture was not the property of the United States prior to judgment. When the government lost its forfeiture action, and was ordered to remit the funds to the claimant, the court reasoned that such a result "did not require the United States to remove any money from its coffers. The money belonged to Murray all along. Accordingly, this Court holds that the civil forfeiture judgment in this case was not 'against' the United States ...." *Id.* at 56. The United States did not "own" the money and did not have to disburse it.

However, in *United States v. $319,820.00 in United States Currency*, 634 F.Supp. 700 (N.D.Ga.1986), the court found that

---

held that an attorney is not entitled to the benefits of section 475 unless he has commenced an action or asserted a counterclaim on behalf of his client." *United States v. J.H.W. & Gitlitz Deli & Bar. Inc.*, 499 F.Supp. 1010, 1014 (S.D.N.Y.1980). Ripa argues that he did in fact raise a counterclaim, in the form of "Romano's claim for the immediate return of the seized funds plus interest." Item 31, Page 10. However attenuated as this assertion may first appear, it must be remembered that the instant interpleader action, where Romano is listed as a defendant, is based on a forfeiture proceeding where Romano was captioned as a claimant. In this type of action, no counterclaim could be filed. And although Ripa was engaged in this action after it had ongoing for several years (having been hired after the death of Mr. Romano's first attorney), he was not the one to file the suit. Based on a strict reading of Judiciary Law § 475, it would appear that Ripa did not assert a lien under local law, since he neither initiated suit nor filed a counterclaim.

But here again, given these facts, the court believes that such a strict reading would not be proper. The kind of attorney's liens to which section 475 applies concern state court claims (such as personal injury, divorce) where the attorney succeeded in the action or on a counterclaim in creating a fund for the client out of which he or she would be paid first (assuming there are other superseding claims on the fund). Cases interpreting section 475 have not dealt with forfeitures, and no case law holds that an attorney defending a forfeiture creates a fund and therefore a lien under state law.

Given that the main purpose of section 475 is to pay the attorney out of a fund he created, and given that Ripa did create the fund, Ripa has satisfied the second prong of section 6323(b)(8) of holding a lien under local law.

Precedent also exists that a one-third contingency fee is "reasonable." *Schweizer v. Mulvehill*, 93 F.Supp.2d 376, 402 (S.D.N.Y. 2000).

Even though the United States will not have to pay any of its own money to satisfy such a forfeiture judgment, the judgment is 'against the United States' in the sense that the Government has lost its attempt to secure a forfeiture of the defendant property and must return seized property. Subsection (b)(8) of § 6323 does not require more.

*Id.* at 704.

This court finds the analysis in *$319,820* more persuasive. In a practical sense, even though the United States accrued no new liability, since it could satisfy the judgment from funds already in its coffers, the United States still initiated an action against the money, possessed the money, and lost its effort to keep the money. That decision was clearly adverse to its interests.

Because this court finds that the judgment was "against the United States," it finds that the setoff provision of section 6323(b)(8) applies. Ripa showed that he created a fund and obtained a judgment. Even assuming that he established a lien under local law and that his fees were reasonable, his effort finally founders because the judgment was against the United States. In that circumstance, the IRS is entitled to a setoff. The $169,981 lien against Romano, later reduced to judgment, has accumulated penalties and interest over the years, and has grown to a debt of over $750,000 that Romano owes for 1983 taxes in addition to his other federal tax liabilities. That amount is offset against the $359,500 plus interest that was originally seized, and the IRS takes the entire amount. *See Boyle v. Peterson,* 1994 WL 376085 at *1 (S.D.N.Y. July 15, 1994) ("A stakeholder is not entitled to attorney's fees from a fund when the total amount in the fund is insufficient to satisfy prior federal tax liens.")

The legislative history of § 6323(b)(8) supports such a result. When confronted with a federal tax lien versus attorney's lien issue, a number of cases point out that the primary purpose of the statute was to "collect[ ] taxes, not bestow[ ] benefits on attorneys." *Montavon v. United States,* 864 F.Supp. 519, 523 (E.D.Va.1994) (quoting *Hill, Christopher, & Phillips, P.C. v. United States Postal Service,* 535 F.Supp. 804, 810 (D.D.C.1982)). "Congress intended § 6323(b)(8) to encourage attorneys to bring suits and obtain judgments that would put their clients in a position to be better able to pay their tax liabilities." *In re McGaughey,* 1999 WL 282780 at *2. Consequently, "the attorney receives no protective consideration for his efforts on behalf of a client with a tax liability if the funds to satisfy that liability are going to come from a judgment against the Government." *Hill, Christopher,* 535 F.Supp. at 809. That case bluntly comments that "[a]n attorney is not given a share of the judgment when he merely takes money out of one of the Government's pockets so it can be put back in another." *Id.*

### III.  Equitable Arguments

Romano advances a number of other arguments that can be loosely aggregated under the heading of equity. (1) "If the government charges a higher rate of interest for the taxes on the seized funds than they will pay the claimant for 'wrongfully' withholding the funds, the government will receive an unjust windfall" [Point Three, Memorandum of Law in Support of Defendants' Motion for Summary Judgment—Item 19]; (2) Failure to Pay Penalties cannot be assessed if such failure is due to reasonable cause [Point Four]; (3) When the IRS served a notice of levy on the U.S. Customs Service, the tax should be deemed paid [Point Five]; (4) Alternatively, the seized funds are not taxable until said funds are released and should have

been considered a deductible loss [Point Six]; and (5) Equity and fairness dictate the abatement of failure to pay penalties and interest [Point Seven]. For these propositions, Mr. Ripa provides a dearth of case law; and the cases he does cite are inapposite.

The court agrees with the government's arguments in opposition to the points above. First, in order to have the government apply the seized funds to the 1983 termination assessment, Romano would have to have filed a timely administrative claim for a refund or credit in order to demand that the surplus (the seized funds less the termination assessment) be credited to other tax liabilities (for years 1981 and 1982). *United States v. Dalm,* 494 U.S. 596, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990) (timely claim for refund is jurisdictional prerequisite to suit for refund or credit). Romano failed to do so. He also failed to make any motion in the forfeiture action to have the seized funds applied to his outstanding taxes, and this point fails.

This court agrees with the government that Romano's points one–four above are barred by the doctrine of res judicata. In *United States v. Romano,* 938 F.2d 1569, 1571 (2d Cir.1991), the Second Circuit, reviewing Romano's criminal tax case, specifically addressed and rejected Romano's argument that his 1983 income taxes were paid when U.S. Customs seized the $359,000 he was attempting to drive into Canada. Therefore, no application of the disputed funds needed to be credited to Romano's tax liabilities until the Clerk of the Court pays those funds to the IRS.

On the last point, Romano invokes the principles of equity and fairness. Romano claims that the government will be required, as a matter of equity, to abate interest and penalties on the interpled funds once the funds are distributed to the government. Section 2201 of Title 28 clearly prohibits declaratory judgments respecting federal taxes. The determination of whether to abate interest is solely within the discretion of the Treasury and courts lack authority to compel such abatements. *Bax v. Commissioner,* 13 F.3d 54, 58 (2d Cir.1993) (and cases cited therein).

Finally, simply because Mr. Romano was successful in the forfeiture action, does not mean, as Mr. Ripa asserts, that the money was "wrongfully" taken, and his arguments invoking equity are unavailing.

## CONCLUSION

For the reasons set forth above, the court denies Ripa and Romano's motion for summary judgment and grants the United States' cross-motion for summary judgment, and directs the Clerk of the Court to release the currency to the IRS.

So ordered.