UNITED STATES of America, Plaintiff,

v.

**$359,500 IN UNITED STATES CURRENCY, Defendant.**

Nos. 84–CV–661C.

United States District Court,
W.D. New York.

Sept. 28, 1998.

Denise E. O'Donnell, United States Attorney (Gregory L. Brown, Assistant United States Attorney, of counsel), Buffalo, NY, for U.S.

Glenn H. Ripa, New York City, for Defendant.

## BACKGROUND

CURTIN, District Judge.

The United States brought this civil action pursuant to 31 U.S.C. §§ 5316(a) and 5317(b) seeking the forfeiture of the captioned currency because the claimant, Benedetto Romano, failed to file a Currency and Monetary Instrument Report ("CMIR") in violation of 31 U.S.C. § 5311, *et seq.*, when he crossed the Peace Bridge heading from Buffalo, New York, to Fort Erie, Ontario, Canada, on November 17, 1983, carrying $359,500. This case originally went to trial on May 10, 1985. On September 29, 1986, this court denied the government's petition for forfeiture, finding that actual knowledge of the currency reporting requirements is required for a civil forfei-

ture, and that there was insufficient evidence to support a finding that Romano had any such knowledge. *United States v. $359,500 in U.S. Currency,* 645 F.Supp. 638 (W.D.N.Y. 1986). On September 8, 1987, the Second Circuit held that although actual knowledge of the reporting requirements is not required for civil forfeiture, under the Fifth Amendment's due process clause, a claimant must have had constructive knowledge of the requirements. *United States v. $359,500 in U.S. Currency,* 828 F.2d 930 (2d Cir .1987). The Second Circuit remanded the case for a determination of whether Romano had constructive knowledge.

Following the remand, the government noticed Romano for a deposition to be held on February 3, 1988 (Item 39, at 1–2). A few days before the scheduled deposition, both counsel for Romano and the government learned for the first time that Romano was the subject of a grand jury inquiry in the Eastern District of New York for income tax evasion for the tax years 1981, 1982, and 1983 (*Id.* at 2). At the deposition, Romano invoked his Fifth Amendment privilege against self-incrimination on areas of inquiry concerning the source of the defendant currency, how and when he had generated the money, where he had kept the money, the financial operations of his pizza business, the purpose of his trip to Canada, and his reasons for exporting the money (Item 41). These areas of inquiry related directly to the question of whether Romano should have known that he had to report the amount of currency he was transporting when he attempted to leave the country on November 17, 1983.

The government moved for a stay until the conclusion of multiple criminal and civil actions then pending against Romano in the Eastern District of New York (Item 38). On February 17, 1989, the court granted the stay, finding that the questions posed by the government at Romano's deposition were relevant under Fed.R.Civ.P. 26(b)(1) (Item 49). The court directed the parties to finish the deposition once the civil and criminal matters in the Eastern District were completed, at which time the potential Fifth Amendment

hazard to Romano would have abated.[1]

The criminal case initially resulted in a conviction of Romano, but was later reversed on appeal. *United States v. Romano,* 938 F.2d 1569 (2d Cir.1991). The Second Circuit held that "Romano could not have been guilty of evading taxes on November 17, 1983, when he crossed the Peace Bridge, because his tax year was still open and he had yet to owe anything to the IRS." *Id.* at 1573.

On April 8, 1996, the government informed the court by letter that three of the four civil tax cases against Romano had been resolved in the government's favor on summary judgment, and that it looked as if the government would prevail on its pending summary judgment motion in the fourth case (Item 52). The government explained that once the resolution of these cases had become imminent, an inter-agency dispute between the IRS and Customs had erupted. The agencies disagreed over which would retain the $359,500 in the event that the government won the instant forfeiture case. The IRS claimed that it should retain all of the funds, while Customs asserted that it was entitled to the full amount since it had seized the money in the first place. Customs explained that the IRS would be able to levy against the $359,-500 in the event that the government lost in the present action. At the close of the criminal and civil tax cases in the Eastern District, Romano was found liable for over $1.5 million (Item 60, at 2).

In December 1996, the government submitted a formal offer of settlement to Romano in the instant case, explaining that because of his outstanding tax liabilities, he would not recover any of the seized money regardless of the outcome of the case (Item 53). The government explained that if it prevailed in this forfeiture action, Customs would retain the seized money; and if it lost, the IRS would be able to levy against the funds to collect Romano's outstanding tax liabilities. The government offered to resolve this action by agreeing to forfeit only 50 percent of the $359,500, and to allocate the remaining 50 percent to the IRS in partial satisfaction of Romano's tax liabilities. Romano was primarily concerned with getting credit for his outstanding liabilities with the IRS. He wanted to be sure that any money that the government forfeited in this action be credited towards his tax liabilities (Item 69, at 5). Although the parties engaged in several settlement conferences following this offer, they were unable to reach an agreement.

On May 27, 1997, this court held a bench trial on the question of whether Romano had constructive notice of the currency reporting requirements. The parties filed their post-trial memoranda by early September 1997. The court withheld from issuing a decision in this case once it learned that the Supreme Court had granted *certiorari* in a criminal case out of the Ninth Circuit raising some similar issues. *United States v. Bajakajian,* 84 F.3d 334 (9th Cir.1996), *cert. granted,* —— U.S. ——, 117 S.Ct. 1841, 137 L.Ed.2d 1045 (1997).

On June 22, 1998, the Supreme Court announced its decision in *United States v. Bajakajian,* —— U.S. ——, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998). On July 9, 1998, this court directed the parties to submit briefs explaining whether and how *Bajakajian* affects the instant case (Item 74). The parties have filed their briefs on that question, and the court is now ready to issue its findings of fact and conclusions of law.

### *FACTS*

On November 17, 1983, Romano crossed the Peace Bridge in Buffalo, New York, heading towards Fort Erie, Ontario, Canada. When he reached Canadian Customs, he was referred to the secondary inspection station. At the secondary station, Romano spoke with a Canadian Customs officer and voluntarily opened his trunk at the officer's request. The officer found two bags containing several thousand dollars in the trunk. When asked whether he had declared the money before exporting it from the United States, Romano

---

**1.** The parties never took the opportunity to complete the deposition following the completion of the tax cases.

admitted that he had not. The Canadian Customs officer did not permit Romano to enter Canada. He telephoned U.S. Customs on the other side of the bridge informing them of the situation, and ordered Romano to return to the United States.

Upon returning to the American side, a U.S. Customs officer questioned Romano about the currency. Romano initially claimed to have $30,000 to $35,000; however, after further questioning he admitted to possessing over $300,000. Romano was then sent to the secondary inspection area, where he completed Form 4790, Report of International Transportation of Currency or Monetary Instruments. He also filed a baggage declaration form, Form 6059–B, printed in Italian, in which he admitted that he was carrying more than $5,000.[2] When a records check revealed that Romano had not filed a Form 4790 before leaving the United States earlier that day, Customs officials seized the money.

In 1983, there were no signs or other notices on either side of the bridge to inform travelers of the currency reporting requirements. The only notices available on the American side of the bridge appeared in the administrative office. An ordinary traveler who was not aware of the currency reporting requirements would have had no reason to enter the administrative office before crossing the border into Canada. Also, in 1983, as now, a traveler leaving the United States on the Peace Bridge has no contact with any U.S. Customs or Immigration officials. He only pays a toll on the United States side, then drives over the bridge and meets with Canadian Customs officers on the Canadian side. At this point, a traveler is asked questions about his or her citizenship and if there are any items which he or she wishes to declare. There were no signs on the toll booths on the American side of the bridge stating that there was a currency reporting requirement upon leaving.

At the second trial, on May 27, 1997, United States Customs Inspector Richard McClean, a thirty-three-year Customs employee,

testified that the practice and procedure normally utilized by Customs during a secondary inspection of a person entering the United States almost always involves questions prior to any search of a vehicle. Among the questions that were routinely asked in 1983 was a question about the amount of currency the person was carrying (Item 69, at 26–27). Nevertheless, at the Peace Bridge, these questions were asked only of travelers entering the United States.

Romano is a legal resident alien of the United States who emigrated from Italy in 1964. He has lived in Queens, New York, since his arrival. His only formal education was in Italy, where the highest grade he completed was the second grade of grammar school. His native language is Italian. Although he has learned to speak English through social intercourse, he has difficulty speaking, and he reads and writes English very little. He sometimes reads Italian language newspapers, but not with any regularity (*Id.* at 38–40). Since he has lived in the United States, Romano has worked in construction, and he has owned and operated a pizzeria restaurant with his wife (*Id.* at 47–48, 76–78). Romano testified that he and his wife paid for the restaurant's operations with cash or by personal check drawn from his wife's personal account, not through a separate business account (*Id.* at 77–81). Romano acknowledged that he has used an accountant in conjunction with operating the restaurant (*Id.* at 78).

Romano testified that since 1964, he has only left the United States on four occasions. In 1969 he traveled to France and Italy, and in 1970 he traveled to Italy (*Id.* at 41–44). Romano said that he never filled out a currency report before or after either of these trips (*Id.* at 49). Romano traveled to Canada in October 1983, and his November 1983 attempt to travel to Canada resulted in the disputed seizure of the defendant currency.

Romano testified that the purpose of his October 1983 trip to Canada from his home in Queens, a distance of over 400 miles, was to take a "joy ride" (*Id.* at 53–54). Romano

---

**2.** The statute currently requires any person transporting over $10,000 into or out of the United States to report this fact. At the time Romano crossed the bridge, the statute required a person transporting $5,000 to make such a report. Congress amended the statute in October 1984.

remained in Canada for one or two weeks before returning to the United States (*Id.* at 56). Upon his reentry into the United States, Romano was referred to the secondary inspection area inside a garage. At secondary inspection, Customs officials searched his vehicle, including the trunk, while Romano stood by, some five feet away. Romano stated that the search took about thirty minutes. He testified that during the search, Customs officials did not ask him whether he was carrying any currency, or ask him to fill out any declaration forms. He did not see any signs in the secondary inspection area about currency reporting requirements (*Id.* at 56–59). On cross-examination, Romano said that Customs officials did not ask him any questions during this secondary inspection (*Id.* at 71).

On cross-examination, the government demonstrated that at two depositions, conducted on February 3, 1988, and April 16, 1993, Romano had testified that he had not gone to Canada prior to November 17, 1983. At the second deposition, he ultimately admitted having gone to Canada in October 1983, only after counsel for the government confronted Romano with documentary evidence of his travel (*Id.* at 65–69). Romano testified that the source of the defendant currency was his gambling winnings, mostly from a certain illegal gambling establishment on Knickerbocker Avenue in Brooklyn, New York. Romano explained that he won approximately $380,000 playing baccarat in little over one week's time in late September or October 1983 (*Id.* at 81–83). He also admitted to gambling at other illegal establishments in Queens and Manhattan (*Id.* at 87–88).

Romano first claimed that he has only gambled at a legal gambling establishment once, in Atlantic City, and that occurred three or four years prior to this trial (*Id.* at 83–84). However, the government impeached this testimony by demonstrating that at the April 18, 1993, deposition, Romano stated that he had gambled in Atlantic City from the time that it opened (*Id.* at 85–85).

Despite his admitted gambling practices, Romano denied having any knowledge of any requirements of declaring gambling winnings at legal gaming establishments. He claimed that he never won much money at Atlantic City, and he never had to fill out any forms reporting his winnings at any of the illegal gambling establishments (*Id.* at 86–87).

The government has challenged Romano's credibility, pointing to his evasiveness and inconsistent statements throughout his trial and deposition testimony. The most striking inconsistencies are Romano's denial at the 1988 and 1993 depositions that he had been to Canada prior to November 17, 1983, his denial at trial of having gambled at a legal casino prior to 1983, and his denial that he had not filled out Customs forms upon return from his European trips in 1969 and 1970. These areas of inquiry are relevant to the key dispute of whether Romano had constructive knowledge of the currency reporting requirements, and his evasive and inconsistent testimony at trial does raise important credibility concerns. Nevertheless, these concerns must be weighed against Romano's lack of education and difficulties communicating in English.

## *DISCUSSION*

The forfeiture of currency seized in the course of being transported out of the United States involves the interplay of two statutes. Title 31 U.S.C. § 5316(a) requires the filing of a CMIR by any person who "knowingly transports, is about to transport, or has transported, monetary instruments of more than $10,000" from the United States to any place outside.[3] Section 5317(b) authorized the forfeiture of any monetary instrument transported without such a report.[4]

In its order remanding this case for further proceedings, the Second Circuit held that the phrase "knowingly transports" does not require that the person who allegedly failed to comply with the reporting requirements either had actual knowledge of, or willfully intended to violate, those require-

---

**3.** In 1983, the statute required reporting the transport of over $5,000.

**4.** This provision is now codified at 31 U.S.C. § 5317(c).

ments. *$359,500 in U.S. Currency,* 828 F.2d at 934. The court explained that any "due process requirements could be satisfied if the government can show that, under the circumstances, Romano should reasonably have been aware of the likelihood of having to report the currency he endeavored to transport out of the country." *Id.* at 932. The court further explained that:

> [The government] might be able to prove a "probability of such knowledge", *Lambert v. California,* 355 U.S. 225, 229, 78 S.Ct. 240, 243, 2 L.Ed.2d 228 (1957), and thereby satisfy the requirements of due process, by proving that under the particular facts of this case, and given the pervasive government regulation of currency transactions, customs, imports and exports, and the like, Romano should reasonably have known that transporting such a large quantity of currency out of the country was probably a regulated act.... We would need to address the question whether the enactment of § 5316 alone provided Romano with sufficient notice to satisfy due process requirements only if it is determined on remand that Romano cannot properly be charged with such constructive notice.

*Id.* at 936. A review of the civil forfeiture decisions that have been issued since the Second Circuit's remand reveals that the court has not changed its interpretation of this knowledge requirement.

■ The government argues that the evidence adduced at trial supports the conclusion that Romano had constructive, if not actual, knowledge of the currency reporting requirements (Item 71, at 9–12). The government submits that at every turn in his trial testimony, Romano was evasive and untruthful on crucial evidentiary matters that went to the heart of the question of whether he had actual or constructive knowledge. The government contends that Romano's testimonial inconsistencies undercut any credibility that his "ignorant owner" defense might otherwise provide.

The court disagrees. The record does not support a finding that Romano should reasonably have been aware of the likelihood of having to report the currency he was carrying when leaving the United States via the Peace Bridge to Canada. Romano is not a sophisticated man. He was born in Italy, where he lived until he was approximately 24 years old. He had limited formal education. He has difficulty speaking English, and he cannot really read or write in English. He does not even regularly read newspapers in Italian, his native language.

The three previous times Romano left the United States, he was not required to provide any information with respect to currency. When he traveled to Canada in October 1983, Romano was not stopped or questioned by United States officials when he left the United States. There were no signs on or near the Peace Bridge that mentioned that there were currency reporting requirements for people leaving the country. Romano's experience upon his reentry into the United States via the Peace Bridge in October 1983 does not demonstrate that he should reasonably have known that there were reporting requirements governing what a person takes with them when they leave the United States. This case is distinguishable from numerous other Second Circuit cases involving this statute because the facts of those cases involve international travelers who traveled by airplane and who were asked before leaving the United States about whether or not they have more than $10,000 (formerly $5,000) in currency. *See, e.g., United States v. Yuzary,* 55 F.3d 47 (2d Cir.1995) (after being asked by United States Customs Official at JFK Airport, claimant filled out Form 4790 and stated that he was transporting approximately $30,000 when he really had $480,000 in cash); *United States v. $145,139 in U.S. Currency,* 18 F.3d 73 (2d Cir.1994) (when asked by United States Customs Official at JFK Airport, claimant filled out form before leaving U.S. and stated that he was carrying $80 when in fact he had $145,139); *United States v. $83,132 in U.S. Currency,* 1996 WL 599725 (E.D.N.Y. Oct. 11, 1996) (in response to questions by United States Customs Officials at JFK Airport, claimant stated in writing that he was carrying $7,000 in cash, but subsequent examination revealed that he was actually transporting $83,132). In the case at bar, Romano was not asked whether he was transporting

more than $5,000 until after he had left the United States and was told to turn around by Canadian Customs Officials.

Romano testified that when Customs officials searched his car at secondary inspection in October 1983, they did not ask him any questions about any currency he might be carrying. The government's witness, McClean, testified that Customs officials almost always ask questions before and during a vehicle search. Even assuming that the officials who searched Romano's car when he reentered the United States in October 1983 asked him questions about what he might be carrying into the country, there is no reason to believe that this should have put Romano on notice of requirements to report the amount of currency he might carry out of the country.

The fact that Romano obtained the money through illegal gambling and that he had experience gambling at legal casinos does not support a finding that he should have had reason to believe that he had to report the currency he was carrying out of the country. He testified that he never filled out any reports about his gambling winnings at a casino or anywhere else. Even if he had, the court fails to see a connection between gambling declarations required by the federal tax law at casinos and the currency reporting declarations required by Customs for people leaving the country transporting currency.

■ The government argues that the publication of the currency reporting statute in the Federal Register itself constitutes constructive notice of the contents thereof that satisfies the due process clause (Item 66, at 6–8; Item 71, at 13). In its order remanding this case, the Second Circuit declined to reach this question, noting that such an analysis would only be necessary if the District Court found that Romano did not have constructive knowledge of the reporting requirements. *$359,500 in U.S. Currency,* 828 F.2d at 936. Since this court has just found that Romano's background and various life experiences did not put him on notice that he would have to report the currency he was

carrying out of the country, the court must now consider the publication question.

The government submits, and Romano does not dispute, that 31 U.S.C. § 5316 was first published in the Federal Register on December 13, 1972. *See* 37 Fed.Reg. 26517 promulgating 31 C.F.R. § 103.23 (establishing the obligation to file a report when transporting monetary instruments out of the United States), and 31 C.F.R. § 103.48 (restating the statutory forfeiture provision). The government argues that since Romano's failure to report that he was transporting out of the United States more than $5,000 was a violation of these published regulations, he must be charged with notice thereof (Item 66, at 7–8).

Romano contends that it is unreasonable to allow the government to take his property based only on the publication of the statute. He submits that the Second Circuit's discussion in its remand order is replete with distinctions concerning the casual traveler and the implication that in such cases the government should be held to a higher standard.[5]

In another context, the government may be correct that publication in the Federal Register constitutes constructive notice. However, Justice Stevens' dissent in *United States v. Locke,* 471 U.S. 84, 122 n. 10, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985), is illuminating. *Locke* was not a currency forfeiture case, but rather a forfeiture of mining claims under the Federal Land Policy and Management Act of 1976. Justice Stevens stated: "To justify the forfeiture in this case on the ground that appellees are chargeable with constructive notice of the contents of the Federal Register is no more acceptable to me today than it would have been to Justice Jackson in 1947." Justice Stevens was referring to Justice Jackson's dissent in *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 387, 68 S.Ct. 1, 92 L.Ed. 10 (1947) wherein Justice Jackson stated: "To my mind, it is an absurdity to hold that every farmer who insures his crops knows what the Federal Register contains or even knows

---

5. After the Second Circuit decision in this suit, signs have been placed near the entrance to the Peace Bridge informing travelers of the currency reporting requirements. Whether this notice is sufficient to provide casual travelers with notice is not at issue in this case.

that there is such a publication. If he were to peruse this voluminous and dull publication as it is issued from time to time in order to make sure whether anything has been promulgated that affects his rights, he would never need crop insurance, for he would never get time to plant any crops."

Given the circumstances of this case and the complete failure of U.S. Customs to take any affirmative steps to inform the casual traveler of the currency reporting requirements for people leaving the country, it is extremely unfair to deprive Romano of his property based only on the publication of the statute and related regulations in the Federal Register. As the Second Circuit has acknowledged, carrying currency across the border is not a prohibited act or a regulated activity. The reporting requirements are merely informational. "In fact, congress expressed a desire 'not to limit or impede the free flow of currency in international commerce' in enacting the currency reporting statutes." *$359,500 in U.S. Currency,* 828 F.2d at 935 (quoting Senate Committee on Banking and Currency, S.Rep. No. 91–1131, 91st Cong., 2d Sess. at 7 (1970)). As such, the court finds that Romano did not have constructive notice of the informational reporting requirement.

Furthermore, the Supreme Court's recent decision in *United States v. Bajakajian,* ⸺ U.S. ⸺, 118 S.Ct. 2028, 2039, 141 L.Ed.2d 314 (1998) is instructive. In *Bajakajian,* the defendant had attempted to leave the United States via an international flight carrying $357,144. The government charged him with attempting to leave the country without reporting that he was transporting more than $10,000 in currency under 31 U.S.C. § 5322, the criminal forfeiture provision contained in 31 U.S.C. § 5316. The government also sought forfeiture of the $357,144 pursuant to 18 U.S.C. § 982(a)(1) which provides: "The court, in imposing sentence on a person convicted of an offense in violation of section ... 5316, ... shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." Significantly, 18 U.S.C. § 982 was not enacted into law until October 27, 1986, Pub.L. No.

99–570, after the events giving rise to this case.

Defendant Bajakajian pled guilty to the failure to report charge, but elected to have a bench trial regarding the charge under 18 U.S.C. § 982(a)(1). After a bench trial, the District Court held that the entire $357,144 was subject to forfeiture to the government. The court also found that the funds were not connected to any other crime and that defendant was transporting the money to pay a lawful debt. Although § 982(a)(1) directs sentencing courts to impose full forfeiture, the District Court concluded that such forfeiture would be "extraordinarily harsh" and "grossly disproportionate to the offense in question," and that it would therefore violate the Excessive Fines Clause. The District Court instead ordered forfeiture of $15,000, in addition to a sentence of three years of probation and a fine of $5,000—the maximum fine under the Sentencing Guidelines.

The government appealed. On appeal, the Ninth Circuit affirmed the District Court's ruling. The Ninth Circuit held that the currency was not an "instrumentality" of the crime committed because the crime in a currency reporting offense " 'is the withholding of information, ... not the possession or the transportation of the money.' " *United States v. Bajakajian,* 84 F.3d at 337 (quoting *United States v. $69,292 in U.S. Currency,* 62 F.3d 1161, 1167 (9th Cir.1995)). The majority therefore held that § 982(a)(1) could never satisfy the Excessive Fines Clause in cases involving forfeitures of currency. The Supreme Court affirmed this holding.

Although the Supreme Court did not explicitly state that the Excessive Fines Clause analysis applies to civil forfeitures, this court rejects the government's contention that *Bajakajian* only relates to punitive criminal forfeitures (Item 76, at 3–9). The court believes the reasoning in *Bajakajian* is applicable to this case. As the Supreme Court stated:

Failure to report his currency affected only one party, the Government, and in a relatively minor way. There was no fraud on the United States, and respondent caused no loss to the public fisc. Had his crime gone undetected, the Government would have been deprived only of the in-

formation that $357,144 had left the country.

Comparing the gravity of respondent's crime with the $357,144 forfeiture the Government seeks, we conclude that such a forfeiture would be grossly disproportional to the gravity of his offense.

*Bajakajian,* —— U.S. at ——, 118 S.Ct. at 2039. In sum, the Court determined that "[a]lthough the Government has asserted a loss of information regarding the amount of currency leaving the country, that loss would not be remedied by the Government's confiscation of respondent's $357,144." *Id.* at 2034. Based on this reasoning, the Court held that "the full forfeiture of respondent's currency would violate the Excessive Fines Clause." *Id.* at 2041.

Accordingly, in addition to the court's finding above that claimant did not have constructive notice of the informational reporting statutes, 31 U.S.C. §§ 5316–5317, the court finds that under *Bajakajian,* forfeiture of claimant's $359,500 to the government is improper.

### CONCLUSION

Based on the foregoing, the court finds that claimant is entitled to judgment in his favor. Therefore, the government's petition for forfeiture is denied. The Clerk is directed to enter judgment in favor of the claimant.

So ordered.