323 F.3d 73
 UNITED STATES of America, Plaintiff-Counter-Defendant-Appellee,
v.
Glenn H. RIPA, Esq., and Benedetto Romano, Defendants-Counter-Claimants-Appellants,
New York State Department of Taxation and Finance, Defendant-Counter-Claimant.
 Docket No. 01-6099.
 United States Court of Appeals, Second Circuit.
 Argued: January 7, 2002.
 Decided: March 12, 2003.
 
 COPYRIGHT MATERIAL OMITTED Ellen Page Delsole, Tax Division, Department of Justice (Eileen J. O'Connor, Assistant Attorney General, Richard Farber, Tax Division, Department of Justice, Kathleen Mehltretter, United States Attorney, of counsel), Washington, D.C., for Appellee.
 Glenn H. Ripa, New York, N.Y., for Appellants.
 Before: SACK, KATZMANN, and B.D. PARKER, Circuit Judges.
 SACK, Circuit Judge.
 
 
 1
 Defendants Glenn H. Ripa and Benedetto Romano appeal from a decision of the United States District Court for the Western District of New York (John T. Curtin, Judge) granting summary judgment to the United States in an interpleader action brought by the United States to determine rights among the parties to a fund in the amount of $491,236.69. The fund comprises $359,500 in United States currency that the United States Customs Service seized from Romano on November 18, 1983, when Romano attempted to carry it across the border into Canada without completing the required currency reporting form, plus interest since paid by the government thereon. Pursuant to the currency reporting statute, the United States sought civil forfeiture of the sum. The suit was suspended while the government brought an unsuccessful criminal prosecution against Romano for tax evasion. Finally, in 1998, some fifteen years after the seizure, Romano prevailed against the government in the civil forfeiture suit. Because of several tax liens against Romano totaling over $1.5 million, including a lien on the taxes assessed on the currency seized in 1983, the district court ordered the $359,500 plus interest deposited with the clerk of the district court. The court permitted the government to bring a suit in the nature of an interpleader to effect the proper distribution of the fund.
 
 
 2
 The basic principle governing cases assessing the priority of federal tax liens is "first in time, first in right." The government, which created a lien on the sum on the same day it was seized in 1983, therefore asserts a right to first priority in the distribution of the money. Because the interest and penalties on the taxes owed to the government by Romano now exceed the total amount in the fund, the government asserts a claim to the entire fund. Ripa, Romano's attorney, asserts a contrary claim to approximately one-third of the fund, as a contingency-fee payment for his representation of Romano in the forfeiture proceeding. Ripa contends that his attorney's lien has "superpriority" over the government's tax lien under a provision of the Internal Revenue Code (the "Code" or "Tax Code") that allows certain attorneys' liens to take priority over prior government liens. See 26 U.S.C. § 6323(b)(8). In response, the government argues that section 6323(b)(8) does not apply here because the provision contains an exception to attorney's lien superpriority in cases involving a "judgment ... of a claim or of a cause of action against the United States." Id. Because we agree with the government that that exception applies here, we conclude that section 6323(b)(8) is inapplicable. Ripa therefore has no basis for asserting priority over the prior government tax lien.
 
 
 3
 Because the government's claim far exceeds the amount deposited by the government in the interpleader action, we affirm the district court's grant of summary judgment to the government and order disbursement of the fund to the government pursuant thereto. Romano argues that we should employ equitable principles to deny the government interest and penalties on the taxes assessed against him in 1983. The Code provides avenues for the abatement of interest and penalties, some of which may remain open to Romano. But if there is a road to relief for Romano, it lies through the Internal Revenue Service ("IRS") and the Tax Court in the first instance, not through Article III courts such as the district court and this Court of Appeals.
 
 
 4
 The defendants characterize their travails as "Kafkaesque." Appellants' Br. at 27. Our rehearsal of the facts in some detail below tends to support that view. The United States Customs Service wrongfully seized a large sum of money from Romano, which he alleges made it impossible for him to pay taxes he owed the IRS on those funds. Although the government paid interest on the seized money, it did so at a rate so low in comparison to the penalties and interest the IRS was charging him on the unpaid taxes that, ultimately, the amount Romano owed the government in taxes and interest on the fund far exceeded the amount in the fund. Meanwhile, the civil proceedings over title to the seized funds were delayed by related criminal prosecutions, which also eventually proved meritless. When Romano finally prevailed in the civil suit over the seized currency, his money had been eaten up by taxes and penalties on it that, he says, he could not have paid because the government had wrongfully seized his money. We conclude, nonetheless, that Romano has not presented us, as an Article III court, with a legal basis upon which to deliver him from these circumstances. We are no more able to relieve Romano of the absurdity of his situation than we are able to relieve Kafka's Joseph K of the absurdity of his. See Franz Kafka, The Trial (Willa & Edwin Muir, trans., Alfred A. Knopf, rev. ed.1992).
 
 BACKGROUND
 
 5
 The parties have stipulated to the facts as set forth in two prior district court opinions, United States v. $359,500 in United States Currency, 645 F.Supp. 638 (W.D.N.Y.1986) ("$359,500 I"), and United States v. $359,500 in United States Currency, 25 F.Supp.2d 140 (W.D.N.Y.1998) ("$359,500 II"), for the purposes of this appeal.
 
 
 The Seizure
 
 
 6
 United States law does not prohibit the transportation of United States funds abroad. It does require that transportation of funds above a threshold amount be reported to the government for informational purposes. 31 U.S.C. § 5316.
 
 
 7
 On November 17, 1983, Benedetto Romano drove from Buffalo, New York, across the Peace Bridge into Ontario, Canada. The trunk of his car contained $359,500, the proceeds of wildly successful, albeit illegal, gambling activities. $359,500 II, 25 F.Supp.2d at 141, 142-44.[1] Romano was questioned by a Canadian Customs official at the primary customs inspection site. Then, for reasons that were not established at trial, Romano was referred to a secondary inspection site. $359,500 I, 645 F.Supp. at 639. The second Canadian Customs official asked Romano to open his trunk, which Romano did. The official found bags containing thousands of dollars in United States currency. $359,500 II, 25 F.Supp.2d at 142. The official asked Romano if he had declared this money before leaving the United States, and Romano acknowledged that he had not. Id. at 142-43. The official then called United States Customs officials to inform them of the situation and ordered Romano to return to the United States. Id. at 143.
 
 
 8
 After recrossing the bridge, Romano was stopped and questioned by a United States Customs official. Id. Romano initially said he was carrying $30,000 to $35,000, but eventually admitted to having over $300,000 in cash. Id. He then completed a currency reporting form, Form 4790, and a baggage declaration form, Form 6059-B, printed in Italian, on which he acknowledged carrying more than $5,000 — the minimum amount he was required to report. Id. A records check indicated that Romano had not completed a currency reporting form prior to leaving the United States, as required by 31 U.S.C. § 5316(a). $359,500 II, 25 F.Supp.2d at 143.[2] Customs agents therefore seized Romano's $359,500 in currency pursuant to 31 U.S.C. § 5317(b), which authorized the forfeiture of any monetary instrument transported without the filing of a currency report.[3]
 
 
 The Tax Lien on the Seized Currency
 
 
 9
 Later that day, the IRS made a termination assessment against Romano for $169,973 in income tax, based upon the $359,500 in cash that he had been carrying. See United States v. Romano, 938 F.2d 1569, 1570 (2d Cir.1991).
 
 
 10
 A termination assessment [under 26 U.S.C. § 6851] informs the person notified that his or her tax year is terminated as of a certain date and calculates the income tax due. The resulting tax liability becomes due immediately, and the IRS files a tax lien to secure payment of the tax debt. The IRS uses a termination assessment when it discovers that a person possesses an inappropriate amount of cash presumed to be taxable income from a previously undisclosed source and it fears that the collection of taxes may be thwarted if the person puts the cash or herself beyond the government's reach. The filing of a termination assessment does not relieve the taxpayer of her obligation to prepare, sign, and file a true and correct income tax return for that year.
 
 
 11
 Id. at 1570-71.[4] Because the tax liability determined in a termination assessment is due immediately, 26 U.S.C. § 6851(a)(1), the IRS promptly sent a notice of levy to the Customs Service and filed a notice of a federal tax lien with the Erie County Clerk in Buffalo. Romano never filed a federal tax return for 1983. See United States v. New York State Dep't of Taxation and Finance, 138 F.Supp.2d 392, 394 (W.D.N.Y.2001) ("NYSDTF").
 
 
 12
 In November 1989, the United States filed suit in the United States District Court for the Eastern District of New York seeking to reduce the 1983 termination assessment to judgment. On December 14, 1990, the district court granted summary judgment to the United States in the amount of $169,981 plus statutory interest. United States v. Romano, No. CV-89-3862 (E.D.N.Y. Dec. 14, 1990). We affirmed, United States v. Romano, 963 F.2d 1521 (2d Cir.1992) (table), and the Supreme Court denied certiorari, Romano v. United States, 506 U.S. 864, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992).
 
 
 The Civil Forfeiture Action
 
 
 13
 Meanwhile, in 1984, the United States brought a civil action against Romano in the United States District Court for the Western District of New York — the scene of the seizure and the tax lien — seeking forfeiture of the seized currency pursuant to 31 U.S.C. §§ 5316(a) and 5317(b). On September 29, 1986, the district court denied the government's petition for forfeiture, holding that civil forfeiture under section 5316 requires a defendant to have actual knowledge of the currency reporting requirements, and that insufficient evidence supported the conclusion that Romano had such knowledge. $359,500 I, 645 F.Supp. at 641-43. On appeal, we disagreed, holding that actual knowledge of the reporting requirements is not a necessary condition for civil forfeiture, but that the Due Process Clause of the Fifth Amendment requires that a claimant have at least constructive knowledge of the requirements. United States v. $359,500 in United States Currency, 828 F.2d 930, 934, 935 (2d Cir.1987). We remanded the case for a determination of whether Romano had such constructive knowledge. Id. at 936.
 
 
 14
 Before the district court could rule on the remand, the proceedings were interrupted by a criminal action brought by the government against Romano for tax evasion. During the extended pendency of the criminal prosecution, in which Romano was convicted but the conviction was overturned on appeal, Romano, 938 F.2d at 1574, the district court granted a stay of the civil proceedings because Romano refused to answer pertinent questions during his deposition, citing his Fifth Amendment right to avoid self-incrimination, $359,500 II, 25 F.Supp.2d at 141.
 
 
 15
 On May 27, 1997, after the criminal proceedings had concluded, the district court held a bench trial on the issue that we had remanded some ten years previously: whether Romano had constructive knowledge of the currency reporting requirements back in 1983, when he transported the currency across the border. Id. at 142. After further briefing, the court concluded that Romano had no such knowledge. Id. at 145.[5] The district court therefore ordered judgment in favor of Romano.
 
 
 The Interpleader Action
 
 
 16
 In the civil forfeiture action, the district court granted judgment in favor of Romano, but did not award the disputed money to him. Instead, on January 28, 1999, the court issued an order allowing an interpleader action so that the interested parties could litigate their rights to the fund — the amount of the seized currency plus interest paid on it by the government—totaling $491,236.69. NYSDTF, 138 F.Supp.2d at 394-95. The court directed that the money be deposited with the Clerk of Court of the United States District Court for the Western District of New York. Id. at 395.
 
 
 17
 The IRS, the New York State Department of Taxation,[6] and Glenn H. Ripa, Romano's attorney, all asserted claims to the fund. The IRS asserted a claim to the fund based on its 1983 tax lien, originally for $169,973 in taxes, and valued in 2001 at over $750,000 because of interest and penalties. Id. at 395. Ripa appeared pro se before the district court in the interpleader action to assert a right to payment for his legal services.[7] Id. Ripa alleged that he has a statutory attorney's lien with superpriority status over the federal tax lien pursuant to 26 U.S.C. § 6323(b)(8). Ripa's contention is that, based on his fee arrangement with Romano, he is entitled to one-third of the $491,236.69. Ripa thus claims $156,245.56 of the fund — one-third of the fund less $7,500, the amount of a retainer already paid by Romano. Before the district court, Ripa and Romano, and the IRS, filed cross-motions for summary judgment. NYSDTF, 138 F.Supp.2d at 393. The State did not oppose Ripa and Romano's motion, acknowledging that the State's claim is subordinate to the federal income-tax claim. Id.
 
 
 18
 The district court granted the United States's motion for summary judgment on the basis of the priority of its tax lien. Id. at 396-97, 401. It rejected Ripa's claim under 26 U.S.C. § 6323(b)(8), which provides for superpriority for attorney's liens except in cases involving a "judgment ... of a claim or of a cause of action against the United States." The court reasoned that the judgment for Romano in the forfeiture action was a judgment of a claim against the government within the meaning of 26 U.S.C. § 6323(b)(8), and thus that Ripa's claim was not entitled to superpriority status. NYSDTF, 138 F.Supp.2d at 401. The district court also rejected Romano's equitable arguments for abatement of interest and penalties on his unpaid taxes. Id. at 402.
 
 
 19
 Romano and Ripa appeal; the State of New York does not.
 
 DISCUSSION
 I. Standard of Review
 
 20
 We review a district court's grant of summary judgment de novo. Marvel Characters, Inc. v. Simon, 310 F.3d 280, 285 (2d Cir.2002). Summary judgment is appropriate only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); Feifer v. Prudential Ins. Co. of Am., 306 F.3d 1202, 1208 (2d Cir.2002).
 
 II. The Priority of the Liens
 
 21
 Federal law determines the relative priority of a federal tax lien. United States v. Equitable Life Assurance Soc'y of the United States, 384 U.S. 323, 328, 330, 86 S.Ct. 1561, 16 L.Ed.2d 593 (1966); United States v. McCombs, 30 F.3d 310, 321 (2d Cir.1994). Federal law follows the common law rule that a lien "first in time is the first in right." United States v. City of New Britain, 347 U.S. 81, 85, 74 S.Ct. 367, 98 L.Ed. 520 (1954) (internal quotation marks omitted); see also McCombs, 30 F.3d at 321. It is undisputed that the IRS "Notice of Federal Tax Lien," filed November 18, 1983, was the first lien filed with respect to the fund at issue in this litigation. The IRS's lien therefore has priority under the first-in-time rule. Unless the defendants can identify an applicable exception or overriding principle, then, the fund must be released to the government.
 
 
 22
 Ripa asserts that his attorney's lien has priority over the federal tax lien under a statutory exception to the first-in-time rule: the Code's provision for superpriority of some attorneys' liens, 26 U.S.C. § 6323(b)(8).[8] Section 6323(b)(8) was established by the Federal Tax Lien Act of 1966, "the first comprehensive revision and modernization of the provisions of the internal revenue laws concerned with the relationship of Federal tax liens to the interests of other creditors." H.R.Rep. No. 1884, at 1 (1966). The Act's amendments to the Code created superpriority for various creditors, such as mechanics, on the theory that the work of these creditors was "likely to add to the value of the property" to the ultimate benefit of the government. Id. at 6. Similarly, the Act added a provision establishing superpriority for attorneys' liens under certain circumstances. 26 U.S.C. § 6323(b)(8). Specifically, section 6323(b)(8) provides that an existing federal tax lien will not be valid
 
 
 23
 [w]ith respect to a judgment or other amount in settlement of a claim or of a cause of action, as against an attorney who, under local law, holds a lien upon or a contract enforceable against such judgment or amount, to the extent of his reasonable compensation for obtaining such judgment or procuring such settlement....
 
 
 24
 Id. Ripa argues that under this provision he is entitled to superpriority for his reasonable fees accrued during his successful defense of Romano in the forfeiture action.
 
 
 25
 But section 6323(b)(8) contains an exception to the superpriority of attorneys' liens:
 
 
 26
 [T]his paragraph shall not apply to any judgment or amount in settlement of a claim or of a cause of action against the United States to the extent that the United States offsets such judgment or amount against any liability of the taxpayer to the United States.
 
 
 27
 Id. The question, then, is whether the forfeiture suit resulted in a "judgment ... of a claim or of a cause of action against the United States" within the meaning of section 6323(b)(8). Ripa argues that, because a federal district court has determined that the money was wrongfully seized from Romano, and the money was at all times Romano's, never belonged to the United States, and the judgment was therefore not "against the United States."
 
 
 28
 Ripa's argument finds support in a decision by the United States District Court for the District of Massachusetts, United States v. Murray, 963 F.Supp. 52 (D.Mass. 1997). The Murray court reasoned that a successful defense against a currency forfeiture action by the United States does not result in a judgment "against the United States" within the meaning of section 6323(b)(8) because "[t]he money belonged to [the defendant] all along." Id. at 56. The return of the money thus does not "require the United States to remove any money from its coffers." Id. Two other district courts in addition to the district court in this action, however, have considered the question and held otherwise. See United States v. $319,820.00 in United States Currency, 634 F.Supp. 700, 704 & n. 5 (N.D.Ga.1986); Brooks v. United States, 271 F.Supp. 671, 674 (E.D.Ky.1967).
 
 
 29
 Statutory analysis begins with the plain meaning of the statute. Natural Resources Defense Council, Inc. v. Muszynski, 268 F.3d 91, 98 (2d Cir.2001). If the text of a statute is ambiguous, then we must construct an interpretation consistent with the primary purpose of the statute as a whole. Connecticut ex rel. Blumenthal v. U.S. Dep't of Interior, 228 F.3d 82, 89 (2d Cir.2000), cert. denied, 532 U.S. 1007, 121 S.Ct. 1732, 149 L.Ed.2d 657 (2001).
 
 
 30
 The plain language of section 6323(b)(8) does not supply a clear answer to the question before us. As noted above, we understand the question to be whether a judgment for the defendant in a forfeiture suit brought by the government is a "judgment ... of a claim or of a cause of action against the United States." This language contains several ambiguities. The phrase "against the United States" could modify "judgment," "claim," "cause of action," or some combination of the three, while each of the terms has more than one possible meaning. The district court interpreted "against the United States" to modify "judgment" — asking whether "the return of the seized funds constitute[s] a `judgment against the United States,'" NYSDTF, 138 F.Supp.2d at 400 — and answered the question in the affirmative. Though we disagree with the district court's construction of the statutory language, we are unable to resolve the ambiguity in the language, and we therefore interpret the statute in accordance with its purpose. We conclude that the statute does not give superpriority to the attorney's lien Ripa asserts.
 
 
 31
 As noted, the district court's formulation of section 6323(b)(8) implies that the prepositional phrase "against the United States" modifies "judgment." NYSDTF, 138 F.Supp.2d at 400. But the phrase "against the United States" must modify "claim or ... cause of action" because the words "judgment" and "amount" are established as equivalents in the later phrase "offsets such judgment or amount."[9] Thus, "judgment" is opposed to "amount in settlement," and the entire phrase might be aptly punctuated as follows: "this paragraph shall not apply to any judgment [—] or amount in settlement [—] of a claim or of a cause of action against the United States." The key question here is therefore properly framed as whether the suit is one involving an award resulting from a "claim or ... cause of action against the United States."
 
 
 32
 Even under our reframing of the provision, the plain language remains ambiguous. On the one hand, a "judgment ... of a claim or of a cause of action against the United States" could encompass the result in a forfeiture suit, such as Romano's, in which the taxpayer and the government were hostile parties in a lawsuit styled as a proceeding against the money itself. On the other hand, the scope of a "judgment... of a claim or of a cause of action against the United States" might be limited to those suits in which a taxpayer brings an action against the United States as the defendant to assert a claim to property owned by the United States. These two readings — and perhaps others — are possible because the terms "claim," "cause of action," and "against" all have multiple meanings. For example, "claim" and "cause of action" have overlapping meanings, including a right to something and a demand or suit filed in pursuit of something.[10] Moreover, if we read "against" as merely hostile or adverse, then the phrase "against the United States" encompasses any action in which the United States is an adverse party.[11] But we could also read "against the United States" to connote an active challenge to governmental action or property,[12] rather than an attempt, as here, simply to reacquire one's own property, by defending against a claim to that property asserted by the government. Because the plain language of the provision is thus ambiguous, we turn to its purpose to try to give the appropriate meaning to its words.
 
 
 33
 In contrast to its plain language, the purpose of section 6323(b)(8) seems clear. As the district court cogently observed:
 
 
 34
 [T]he primary purpose of the statute was to "collect[] taxes, not bestow[] benefits on attorneys." Montavon v. United States, 864 F.Supp. 519, 523 (E.D.Va.1994) (quoting Hill, Christopher, & Phillips, P.C. v. United States Postal Service, 535 F.Supp. 804, 810 (D.D.C.1982)). "Congress intended § 6323(b)(8) to encourage attorneys to bring suits and obtain judgments that would put their clients in a position to be better able to pay their tax liabilities." In re McGaughey, [1999 WL 282780, at *2, 1999 U.S. Dist. LEXIS 4600, at *6 (S.D.Ill.1999) ]. Consequently, "the attorney receives no protective consideration for his efforts on behalf of a client with a tax liability if the funds to satisfy that liability are going to come from a judgment against the Government." Hill, Christopher, 535 F.Supp. at 809.
 
 
 35
 NYSDTF, 138 F.Supp.2d at 401. When a lawyer represents a taxpayer against a party other than the government, the lawyer is working to reach a result that will, if successful, enlarge the amount of funds available to the government to satisfy its tax claim. The lawyer is then probably acting in the government's best interests. If the lawyer cannot be paid out of the amount collected, however, he or she is unlikely to pursue the claim in the first place and the government is, potentially, that much the poorer. If the lawyer represents a taxpayer whose interests are adverse to the government, however, the funds available to the government will not be enhanced by the lawyer's services.
 
 
 36
 In light of the purpose of section 6323(b)(8), then, we see no reason to read "a judgment ... of a claim or of a cause of action against the United States" to exclude the monetary award in the forfeiture suit, in which Romano and the United States had adverse claims to the disputed fund. Thus, the exception to superpriority of attorneys' liens in judgments of claims against the United States applies to Ripa's lien for his fees incurred when defending Romano's claim to his money in the forfeiture action.[13]
 
 
 37
 Ripa also argues that the exception to section 6323(b)(8) does not apply here because the government has no right to offset in this case. As the Supreme Court has explained, the right to offset, or "set-off," is the right to "strike a balance between the debts and credits of the government." United States v. Munsey Trust Co., 332 U.S. 234, 240, 108 Ct.Cl. 765, 67 S.Ct. 1599, 91 L.Ed. 2022 (1947). Ripa argues that the government cannot offset in this case because the common law of offset requires "mutuality" between the countervailing claims, citing Lines v. Bank of America National Trust & Savings Association, 743 F.Supp. 176 (S.D.N.Y.1990), for the proposition that "[m]utuality is not present when the creditor has no debt to off-set against the debtor except the liability for the wrongful conversion," id. at 183. Ripa contends that, because the government's seizure of his money was wrongful, the government has no right to offset, and section 6323(b)(8) does not apply. But Ripa has cited no cases that apply the idea of "mutuality" to offsets between a private party and the government, rather than between two private parties. And we have held that the United States has the right to offset a fine and interest thereupon against an order to return seized currency. Ikelionwu v. United States, 150 F.3d 233, 239 (2d Cir.1998). Reading section 6323(b)(8) in light of the statute's purpose of maximizing federal revenue, we therefore see no reason to conclude that Congress intended to circumscribe the government's ability to offset based on equitable principles applied to private creditors under common law.[14]
 
 
 38
 We conclude that the district court correctly held that Ripa can assert no priority on behalf of his attorney's lien over the federal tax liens under section 6323(b)(8).
 
 
 39
 III. Romano's Arguments for Abatement of Interest and Penalties
 
 
 40
 Romano does not challenge his liability for unpaid taxes. He questions only the interest and penalties assessed against him. He argues for relief on equitable grounds and also on the basis of several provisions of the Code.
 
 
 41
 Romano's equitable argument is that the government receives an unjust windfall from its illegal seizure if he has to pay interest and penalties on the money that was seized. He argues that it is unfair for the government to charge a higher rate of interest on unpaid taxes than it pays him on the seized funds. Romano also contends, without supporting evidence, that the money seized by Customs was the only money with which he could have paid the taxes assessed against him. It is therefore unfair, he argues, for one branch of the government to charge him interest and penalties on taxes that another branch of the government deprived him of the ability to pay.
 
 
 42
 But Congress has not given us general equitable powers to grant relief from whatever unfairness may be prescribed by the Tax Code or other federal statutes.[15] The different rates of interest applied to money held by the government and money owed to the government are set by statute, and we are not at liberty to change them. We also have no power to grant relief by analogy to inapplicable provisions of the Code. For example, Romano seeks relief based on provisions of the Code allowing for interest netting — i.e., the cessation of interest on an underpayment of tax on the date when an overpayment of tax is made. See 26 U.S.C. § 6621(d); see also id. §§ 6601(a), 6611(a). Because this case involves no "overpayment" of taxes, these provisions, by their plain language, do not apply here.
 
 
 43
 As for Romano's alleged inability to pay his taxes because of government action, Romano and the government have identified some provisions of the Code setting out grounds for relief from penalties and interest. But a request in a district court for relief from penalties under 26 U.S.C. § 6651[16] must be preceded by payment of the penalties and submission of a duly filed refund claim to the IRS.[17] See 26 U.S.C. § 7422(a). Romano has neither paid the penalties nor submitted a refund claim. The grounds for abatement of unpaid interest are limited and must begin with an application for relief from the Secretary of the Treasury. See 26 U.S.C. § 6404(e). Romano has filed no such application.[18] Because Romano's claims should be, or should have been, brought to the IRS and the Tax Court in the first instance, these claims were not properly before the district court, and they are not properly before us.
 
 
 44
 We conclude, then, that the matter that we may address in this interpleader action is limited to who has the right to the money that has been paid into court. A judgment by a federal district court correctly established Romano's debt to the IRS of $169,981, plus statutory interest, United States v. Romano, No. CV-89-3862 (E.D.N.Y. Dec. 14, 1990), aff'd, 963 F.2d 1521 (2d Cir.) (table), cert. denied, 506 U.S. 864, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992), and it is undisputed that that amount, together with penalties, now exceeds the amount of the fund. Because we also agree with the district court that Ripa cannot successfully claim priority over the federal tax lien under section 6323(b)(8), we affirm the district court's judgment that the fund should be released to the United States.
 
 
 45
 With our conclusion that the government's claim to the fund prevails, our task is complete. We do not doubt that the question of whether it is right and just for the government to obtain the money is an important one. It is, however, a question for the IRS, the Tax Court, and Congress. It is not before us on this appeal.
 
 CONCLUSION
 
 46
 For the foregoing reasons, we affirm the judgment of the district court.
 
 
 
 Notes:
 
 
 [1]
 To this day, it is unclear why Romano chose to take his winnings for a ride
 
 
 [2]
 31 U.S.C. § 5316 currently provides:
 (a) Except as provided in subsection (c) of this section, a person or an agent or bailee of the person shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly —
 (1) transports, is about to transport, or has transported, monetary instruments of more than $10,000 at one time —
 (A) from a place in the United States to or through a place outside the United States; or
 (B) to a place in the United States from or through a place outside the United States; or
 (2) receives monetary instruments of more than $10,000 at one time transported into the United States from or through a place outside the United States.
 31 U.S.C. § 5316(a). In 1983, the statute required travelers to report amounts over $5,000. $359,500 II, 25 F.Supp.2d at 144 n. 3.
 
 
 [3]
 Section 5317 then provided:
 . . . .
 b) A monetary instrument being transported may be seized and forfeited to the United States Government when a report on the instrument under section 5316 of this title has not been filed or contains a material omission or misstatement. A monetary instrument transported by mail or a common carrier, messenger, or bailee is being transported under this subsection from the time the instrument is delivered to the United States Postal Service, common carrier, messenger, or bailee through the time it is delivered to the addressee, intended recipient, or agent of the addressee or intended recipient without being transported further in, or taken out of, the United States.
 31 U.S.C. § 5317(b), quoted in $359,500 I, 645 F.Supp. at 641 n. 2. This subsection was relettered in the 1984 amendments; it is now subsection "c." There are no relevant substantive changes. Id.
 
 
 [4]
 Section 6851 provides:
 If the Secretary finds that a taxpayer designs quickly to depart from the United States or to remove his property therefrom, or to conceal himself or his property therein, or to do any other act ... tending to prejudice or to render wholly or partially ineffectual proceedings to collect the income tax for the current or the immediately preceding taxable year unless such proceeding be brought without delay, the Secretary shall immediately make a determination of tax for the current taxable year or for the preceding taxable year, or both, as the case may be, and notwithstanding any other provision of law, such tax shall become immediately due and payable.
 26 U.S.C. § 6851(a)(1).
 
 
 [5]
 The court further concluded that even if constructive knowledge had been established, forfeiture of the entire sum would violate the Excessive Fines Clause of the Eighth AmendmentId. at 147-48 (citing United States v. Bajakajian, 524 U.S. 321, 339-340, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998)). In other words, the court held that payment of more than $350,000 for failing to complete a routine informational form would be excessive. Id.
 
 
 [6]
 New York State has also docketed tax warrants against Romano. The state warrants, which were docketed with the Queens County Clerk, comprise one filed March 23, 1994, in the amount of $48,549.15; two filed on December 30, 1997, in the amounts of $22,296.14 and $98,040.07; and one docketed on September 25, 1998, in the amount of $4,787.88Id. at 394 n. 3.
 
 
 [7]
 Murray Appleman represented Romano for most of the proceedings described aboveId. at 395. After Mr. Appleman's death, Romano retained Ripa on August 28, 1995. Id. Romano and Ripa agreed on a one-third contingency-fee arrangement, which was later modified to include a $7,500 advance payment. Id.
 
 
 [8]
 For the purposes of this discussion, we assume without deciding that Ripa has satisfied the following conditions that courts have identified for the application of section 6323(b)(8): "(1) that a fund was created out of a judgment or settlement of a claim; (2) that local law would recognize the existence of a lien; and (3) that the amount of the lien reflects the extent to which [the lawyer's] efforts `reasonably contributed to the award.'"See Markham v. Fay, 1993 WL 160604, at *6, 1993 U.S. Dist. LEXIS 6486, at *19 (D.Mass. May 5, 1993) (citations omitted); accord NYSDTF, 138 F.Supp.2d at 397. We also need not and do not address the question, raised by the government, whether Ripa has properly assessed the sum that he would be owed from the fund, were section 6323(b)(8) to apply.
 
 
 [9]
 And, of course, one meaning of "judgment" is "an obligation (as a debt) created by decree of a court."Webster's New International Dictionary 1223 (3d ed.1981).
 
 
 [10]
 The first three definitions of "claim" inBlack's Law Dictionary display both meanings:
 
 
 [1]
 The aggregate of operative facts giving rise to a right enforceable by a court
 
 
 [2]
 The assertion of an existing right; any right to payment or to an equitable remedy, even if contingent or provisional
 
 
 [3]
 A demand for money or property to which one asserts a right
 
 
 [4]
 An interest or remedy recognized at law; the means by which a person can obtain a privilege, possession, or enjoyment of a right or thing; CAUSE OF ACTION
 Black's Law Dictionary 240 (7th ed.1999). The first two definitions of "claim" in Webster's New International Dictionary present two meanings that parallel those offered in Black's. The first definition includes the phrases "an authoritative or challenging request: DEMAND" and "a demand for compensation, benefits, or payment." Webster's New International Dictionary 414 (3d ed.1981). By contrast, the second definition of "claim" is simply "a privilege to something: RIGHT." Id.
 As apparent from the fourth definition of "claim" in Black's, "cause of action" may be synonymous with "claim"; it also may mean the basis of a lawsuit or the lawsuit itself:
 
 
 [1]
 A group of operative facts giving rise to one or more bases for suing; a factual situation that entitles one person to obtain a remedy in court from another person; CLAIM
 
 
 [2]
 A legal theory of a lawsuit
 
 
 [3]
 Loosely, a lawsuit
 Black's Law Dictionary 214 (7th ed.1999).
 
 
 [11]
 The first definition of "against" inWebster's New International Dictionary is "directly opposite: in front of: FACING," and the fourth definition is perhaps a figurative version of the first: "in opposition or hostility to." Webster's New International Dictionary 39 (3d ed.1981). The first example given for that third definition indicates that either party may initiate the opposition: "stood steadfast [against] alumni pressure." Id. (citation omitted).
 
 
 [12]
 TheOxford English Dictionary offers the following under its twelfth definition of "against": "c. to be against: to be opposed, unfavourable; the opposite of for, in favour of. Esp[ecially] in [the] phr[ase] against the government, opposed to the established view, rulers, etc." Oxford English Dictionary (2d ed.1989), available at http://dictionary.oed.com (last visited February 7, 2003).
 
 
 [13]
 Ripa also contends that the attempted forfeiture in this case was a fine, that fines are a form of punishment, and that their return is therefore not a judgment against the government. We see nothing in the text or purpose of section 6323(b)(8) to support this reason for exempting forfeiture actions from the exception to superpriority for judgments in claims against the government
 
 
 [14]
 Because we hold that the government has properly asserted that its lien has priority over any attorney's lien asserted by Ripa, we need not and do not address the government's argument that it has an independent right to offset against the fund
 
 
 [15]
 Romano has not argued his case on constitutional grounds, but he does cite the Seventh Circuit case ofUnited States v. Pittman, 449 F.2d 623 (7th Cir.1971), which refers to the Fifth Amendment. Pittman held that if the IRS effectively seizes a taxpayer's property in satisfaction of a tax debt under 26 U.S.C. § 6331, but fails to sell the property promptly as required by 26 U.S.C. § 6335, then the taxpayer deserves credit against his tax liability under 26 U.S.C. § 6342 for the value of the property at the time the IRS was statutorily required to sell the property. See 449 F.2d at 626-28. The facts and law of Pittman are thus distant from this case. Because Romano has not properly presented us with a constitutional argument, we do not consider whether the Constitution would afford him any relief.
 In his discussion of Pittman, Romano also asserts that the district court had the authority to grant the relief he seeks because "this is similar to a claim for refund case which [sic] statute of limitations starts to run from the time the tax is paid." Appellant's Br. at 24. As discussed below, however, the district court and this Court both lack the power to grant relief by analogy to inapplicable provisions of the Code.
 
 
 [16]
 Section 6651 permits relief from penalties where "it is shown that [the] failure [to pay taxes] is due to reasonable cause and not due to willful neglect." 26 U.S.C. § 6651(a)(1). The requisite analysis for abatement of penalties involves detailed examination of the taxpayer's financial situation in the relevant tax years, as well as the taxpayer's efforts to pay the taxes at issueSee Fran Corp. v. United States, 164 F.3d 814, 816-17 (2d Cir.1999); Glenwal-Schmidt v. United States, No. 77-0902, 1978 WL 4527, at *3, 1978 U.S. Dist. LEXIS 16635, at *7-*8 (D.D.C.1978).
 
 
 [17]
 There is some disagreement among courts as to whether a taxpayer must pay all of the penalties prior to filing the refund claim that satisfies the requirements of section 7422See, e.g., Carroll v. United States, 198 F.Supp.2d 328, 345-47 (S.D.N.Y.2001); Lefrak v. United States, No. 94 CIV. 7668, 1996 WL 420308, at *4-*6, 1996 U.S. Dist. LEXIS 10594, at *11-*18 (S.D.N.Y. July 26, 1996). Because Romano has neither paid the penalties nor filed a refund claim, we need not and do not address this issue.
 
 
 [18]
 Romano has argued that because the Secretary brought this interpleader action to determine the various claimants' rights to the money, the Secretary gave the district court jurisdiction to determine the amount of the Treasury's interest in the money, including the applicability of section 6404(e) to interest on the tax claim. We find this argument unpersuasive. Prior to 1996, we noted favorably the "substantial authority for the view that interest abatement under section 6404(e)(1) is a discretionary form of relief within the sole authority of the Commissioner and is thereby beyond the scope of judicial review."Bax v. Comm'r, 13 F.3d 54, 58 (2d Cir.1993). Congress's decision in 1996 to add section 6404(h) to the Tax Code, authorizing the Tax Court to review the Secretary's abatement decisions for "abuse of discretion," reinforces the view that section 6404(e) grants discretion to the Secretary. Whatever review might eventually be available in this Court after the Secretary has had an opportunity to exercise his discretion, we are sure that neither we nor the district court can pass on the question in the first instance.